539 P.2d 263

**The STATE of Idaho, Plaintiff-Respondent,**

v.

**Orian COLLINSWORTH, Defendant-Appellant,**

and

**Thomas King et al., Defendants.**

**No. 11164.**

Supreme Court of Idaho.

Aug. 4, 1975.

Wayne L. Kidwell, Atty. Gen., Boise, Jake W. Peterson, Asst. Atty. Gen., for plaintiff-respondent.

William J. Tway, of Webb, Johnson, Tway, Redford & Greener, Boise, for defendant-appellant.

McFADDEN, Justice.

After a jury trial, Orian Collinsworth, defendant-appellant, was convicted of the crime of delivery of a controlled substance and of the crime of possession of a controlled substance with intent to deliver. Collinsworth appeals from the judgment of conviction on both counts; we affirm.

On December 1, 1971, J. C. Pruett, an undercover agent of the Boise City-Ada County Vice and Narcotics Squad, while in the company of a drug user whose confidence he had gained, went to a private residence in the city of Boise for the purpose of purchasing a quantity of the controlled substance tetrahydrocannabinols, which is also known by the street name of "THC". According to the agent's testimony, he was met there by Collinsworth, who invited him inside the house and sold him a plastic baggie which the officer believed to contain THC. The agent then left the residence. A few minute later, in the company of other police officers from the Vice and Narcotics Squad, Pruett returned, knocked on the door, entered the house when Collinsworth opened the door, and with the help of the other officers who also then entered the house arrested Collinsworth and two other persons who had been in the house since the agent first arrived there. Thereafter the officers obtained a search warrant and seized what apparently were drugs and related paraphernalia lying on the kitchen table and a leather bank bag from which Collinsworth had taken the plastic baggie containing the substance he had sold the agent minutes before.

Appellant Collinsworth alone was charged in Count I with delivery of the controlled substance "phencyclidine" in connection with the sale he made to the undercover agent; Collinsworth and the two other persons present at the time of the sale and arrest were charged in Count II with possession with intent to deliver of the controlled substance lysergic acid diethylamide (LSD) in connection with the evidence taken from the kitchen table. The three defendants were tried together and Collinsworth was convicted on both counts. The other two defendants were acquitted of the single count with which they had been charged.

On appeal, Collinsworth assigns as error the introduction of testimony of a drug analyst as to the results of his analysis when, ultimately, an objection to the exhibit which he analyzed was sustained; the admission of certain evidence seized pursuant to a search warrant; the admission of the drug purchased by Pruett; the failure to grant defendant's motion for acquittal; and the giving of certain jury instructions. The assignments of error will be discussed in the order above.

We note that Collinsworth was represented at trial by counsel (hereinafter referred to as trial counsel) other than counsel who represents Collinsworth on appeal. All references to Collinsworth's representation at trial relate to the representation by trial counsel and do not reflect upon the representation by counsel on appeal.

Collinsworth argues that it was reversible error to permit a chemist to testify as to his analysis of state's exhibit number one when that exhibit was not subsequently admitted. As originally presented to the court, exhibit number one consisted of a clear plastic baggie containing 28 disk shaped tablets, and a wooden mortar and pestle. The chemist testified that he analyzed the substance in the tablets and on the mortar and pestle and that both sub-

stances were lysergic acid diethylamide (LSD). At this point the state offered the items into evidence; an objection to the introduction of the tablets was sustained on the grounds that the tablets had not been connected to the defendants or their arrest. The mortar and pestle were admitted as exhibit 1A.

■■■ Collinsworth objects to the chemist's testimony regarding his analysis of the tablets. The chemist's testimony was relevant to the admission of the tablets into evidence; thus, it was not error to allow the chemist to testify at that time. Trial counsel did not request the trial court to instruct, nor did the trial court, on its own motion, instruct the jury to disregard the chemist's testimony regarding the tablets when it later developed the tablets were inadmissible by a break in the chain of evidence. It would be better practice to have instructed the jury at this point, but failure to do so is not reversible error. There was other evidence—exhibit 1A, consisting of the mortar and pestle upon which a powder containing LSD was found, exhibit 3, consisting of a cup full of capsules containing LSD, and exhibit 4, consisting of a plate with powder containing LSD—which were properly admitted against Collinsworth and upon which the jury's determination of his guilt can be sustained. There is no indication in the record that either by argument of counsel or instructions by the court the jury was mislead into determining the appellant's guilt based upon evidence offered but rejected. State v. Moen, 94 Idaho 477, 491 P.2d 858 (1971).

Collinsworth argues that "the trial court erred in not refusing to admit evidence seized pursuant to the search warrant merely because a motion to suppress had not been previously filed". After the defendants were arrested, the officers obtained a search warrant. As a result of the arrest and search, the state obtained evidence which was subsequently introduced into evidence as exhibit 1A, exhibit 3, exhibit 4 (each of which is described above) and exhibit 2 which was a green bank bag containing phencyclidine hydrochloride. Although the record and the exhibits suggest a sharp conflict as to the legality of the seizure of exhibit 2,[1] trial counsel did not move to suppress the evidence; rather, trial counsel objected to the introduction of the evidence at trial. The trial court admitted the evidence, ruling that the motion to suppress was not timely made.

Resolution of this issue is governed by ICR 12 which provides that motions to suppress evidence on the ground that it was illegally obtained must be submitted prior to trial ICR 12(b). Failure to make such a motion prior to trial "shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver." ICR 12(f). This issue is one of first impression for this jurisdiction. Inasmuch as ICR 12(f) is similar to Fed.R.Crim.P. 41(e),[2] the cases interpreting the Federal Rules of Criminal Procedure are applicable. The question as to the timeliness of the motion to suppress made at trial is a question for the discretion of the trial court. *United States v. Maloney*, 402 F.2d

---

1. Exhibits 1A, 3 and 4, which are relevant to the LSD count were seized from a table in the kitchen where two defendants were arrested. Thus, these exhibits probably fall within the plain view exception as the officers were in the kitchen incident to valid arrest. See, *State v. Pontier*, 95 Idaho 707, 518 P.2d 969 (1974). Nevertheless, we will not consider the applicability of the "plain view exception" as the motion to suppress was ruled to be not timely made and we affirm that ruling.

2. Rule 41(e): " * * * The motion [to suppress evidence] shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing."

This sentence was deleted by the 1972 amendment. 3 Wright & Miller, Criminal § 661 (1969). Fed.R.Crim.P. 12(f), as amended, is worded identically to ICR 12(f); however, the effective date of this amendment was postponed until August 1, 1975. 62 F.R.D. 271, 287 (1974).

448 (1st Cir., 1968). The purpose of such a rule is to avoid "the serious inconvenience to jurors from unnecessary disruptions of trial to deal with issues that could and should have been raised in advance". *United States v. Bennett,* 409 F.2d 888, 901 (2d Cir., 1969). See, 3 Wright & Miller, Criminal § 673, p. 115 (1969). Trial counsel presented no reason as to why such a motion could not have been made prior to trial. A review of the exhibits and the affidavit for a search warrant, without reference to the testimony at trial, suggests factual conflicts which should have been apparent to counsel prior to trial and which should have been resolved by a hearing on a motion to suppress, not by a motion at trial. Thus, we conclude that the trial judge did not abuse his discretion when he denied the motion to suppress.

Collinsworth submits that the trial court erred in admitting exhibit number five. This exhibit was the phencyclidine hydrochloride purchased by the undercover agent from Collinsworth. Collinsworth argues that the record is insufficient to link the exhibit with the sale.

At trial, the following testimony regarding the exhibit was adduced: The undercover agent, J. C. Pruett purchased a drug represented to be "THC" from Collinsworth and gave the drug to Tom L. Taylor, the officer in charge of the investigation. Taylor "placed it [the drug] into an Idaho Bureau of Narcotics envelope, sealed the same for deliverance to the safe in our office". Taylor then took this article to the state laboratory for testing on December 6, 1972. Defendant's trial counsel introduced as exhibit 6 a laboratory report, numbered 3713, which contained a statement that Officer Taylor delivered to the state laboratory an envelope containing the substance sold to Officer Pruett by Collinsworth. The report indicated this substance was tested and no controlled substances were identified. Another officer, Robert Gholson, testified that he returned the envelope to the Vice Squad safe in the ordinary course of business, as indicated by his signature on the laboratory report (exhibit 6). Officer John L. Lyon testified that he removed the substance from the original envelope (number 3713), placed the substance in a different envelope (number 4658) and took the substance to the state laboratory again. The substance was tested again and found to contain phencyclidine hydrochloride. The substance contained in envelope number 4658 was introduced into evidence as exhibit 5.

The defendant argues that the chain of custody was broken at the point when the drug was taken to the laboratory for the first time; he submits that there is no evidence to link the substance purchased from Collinsworth with the substance Officer Lyon removed from envelope number 3713 and placed in envelope number 4658. However, the laboratory report (exhibit 6) provides the missing link. This exhibit was introduced by defendant's trial counsel and without any limitation as to what purposes the jury could consider the report. The admission of such evidence "is within the sound discretion of the trial court". *State v. Thomas,* 94 Idaho 430, 433, 489 P. 2d 1310, 1313 (1971). Upon the record, we cannot find that the trial court abused its discretion by ruling that the evidence was sufficient to link the substance Collinsworth sold to the undercover agent with the substance introduced as exhibit 5. See, *State v. McFarland,* 88 Idaho 527, 401 P.2d 824 (1965); *State v. Coburn,* 82 Idaho 437, 354 P.2d 751 (1960).

Next defendant contends that the trial court erred by not granting the defendant's motion for judgment of acquittal, arguing that I.C. § 37-2709(c) requires proof that the phencyclidine hydrochloride was of sufficient quantity of phencyclidine hydrochloride such that it had a potential for abuse associated with a depressant effect to the central nervous system, and that the state failed in its proof. In essence, appellant's argument raises two issues: does I. C. § 37-2709(c) require the state to prove that the defendant delivered a quantity of phencyclidine or a substance containing

phencyclidine such that the amount delivered had a potential for abuse associated with a depressant effect to the central nervous system (in other words, does I.C. § 37–2709(c) impose a usable quantity test?); and, does I.C. § 37–2709(c) require the state to prove that phencyclidine hydrochloride is a form of phencyclidine such that phencyclidine hydrochloride has a potential for abuse associated with a depressant effect to the central nervous system.

The statute, passed in a form identical to that of the Uniform Controlled Substances Act, provides:

"37–2709. Schedule III.—(a) The controlled substances listed in this section are included in schedule III.

\*  \*  \*  \*  \*  \*

(c) Unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following *substances having a potential for abuse associated with a depressant effect on the central nervous system:*

\*  \*  \*  \*  \*  \*

(7) Phencyclidine;

\*  \*  \*." [3] (Emphasis added.)

To resolve both issues, we must look to the grammatical construction of the statute as the legislature intended the statute to be construed according to generally accepted principles of English grammar. See, *Nagel v. Hammond,* 90 Idaho 96, 408 P.2d 468 (1965). A reading of the statute indicates that the phrase "having a potential for abuse associated with a depressant effect on the central nervous system", modifies "substances" and does not modify "quantity" or "material, compound, mixture, or preparation". The phrase provides, in the first instance, a legislative guideline as to whether a drug should be classified in Schedule III, and, in the second instance, an administrative guideline for the Board of Pharmacy by which the board decides whether to add or delete a drug from Schedule III. Accord, *State v. Bureau,* 8 Wash.App. 622, 509 P.2d 105 (1973). See, 9 U.L.A., Uniform Controlled Substances Act § 201, Commissioner's Note (1), p. 211 (1973); I.C. §§ 37–2702, 37–2708. As such, the phrase does not require the state to prove that Collinsworth possessed a usable quantity such that the quantity possessed had a potential for abuse; if the legislature intended to require a usable quantity test, the statute would be drafted so that the phrase at issue modified "quantity" and not "substances".

■ Moreover, the phrase in question does not require the state to prove that the substance Collinsworth delivered, phencyclidine hydrochloride, had a potential for abuse. Such a requirement does not comport with the grammatical construction of the sentence. If the legislature had intended that the state be required to prove that the substance Collinsworth delivered, phencyclidine hydrochloride, had a potential for abuse, then the statute would have been drafted so that the phrase in question modified "material, compound, mixture, or preparation", not "substances". All the statute requires in this regard is that the state prove that Collinsworth delivered a substance which contains a drug which the legislature or the Board of Pharmacy has determined to be a substance "having a potential for abuse associated with a depressant effect on the central nervous system". The evidence indicates that Collinsworth delivered phencyclidine hydrochloride and that phencyclidine hydrochloride is a substance containing phencyclidine. Phencyclidine has been determined to be a substance having a potential for abuse. Ac-

3. S.L.1971, Ch. 215, enacted I.C. § 37–2709 into law, punctuating subsection (c) following the words "central nervous system" with a colon, which is the punctuation used in the Uniform Act. The compilation in the Idaho Code 1974 pocket supplement has changed this colon to a semicolon. The version appearing in the session laws is used in the text of this opinion.

cordingly, we find that the state proved the elements required by the statutory phrase in question.[4]

█ Finally, Collinsworth argues that the trial court erred in giving certain instructions on the grounds that these instructions were not a correct statement of I.C. § 37–2709(c). Essentially, defendant raises the same arguments in regard to these instructions as he raised in regard to the construction of I.C. § 37–2709(c) discussed above. His arguments in regard to the instructions are answered by our construction of the statutory phrase; thus, we will not specifically consider them. In any event, defendant's trial counsel did not object to the instructions at trial and so Collinsworth is foreclosed from assigning error upon the basis of the instructions given. ICR 30.

Judgment affirmed.

McQUADE, C. J., and DONALDSON and SHEPARD, JJ., concur.

BAKES, Justice (concurring in part and dissenting in part):

I concur in the conclusion of the Court upholding the appellant's conviction in Count II, possession of the controlled substance LSD, although I would reach the search and seizure issue presented with respect to introduction of the exhibits connected with that count and hold that the exhibits seized from he kitchen table were properly seized by the police because they were within the plain view of the arresting officers who had to enter the kitchen to make an arrest. *State v. Pontier*, 95 Idaho 707, 518 P.2d 969 (1974).

I cannot, however, concur in the Court's result affirming the judgment of conviction in Count I, for delivery of the controlled substance phencyclidine for three

reasons. First, the only evidence upon which conviction for the phencyclidine count could be based was improperly admitted; secondly, the prosecution did not prove that Collinsworth delivered the substance he had been charged with delivering; and third, the prosecution failed to prove that the substance which Collinsworth delivered to the undercover officer or the substance found in the green bank bag was a controlled substance as defined by I.C. § 37–2709.

First, the evidentiary issues. The state introduced into evidence two exhibits which the state's expert witness, Richard Groff, a forensic chemist employed by the State Department of Health, testified contained phencyclidine hydrochloride. These were exhibit 2, a green bank bag containing baggies of powder containing phencyclidine hydrochloride, which was seized from a cupboard or closet in Collinsworth's residence, and exhibit 5, a baggie containing a powder which contained phencyclidine hydrochloride and which the state contends Collinsworth sold to the undercover officer J. C. Pruett.

The majority point out that, "Although the record and the exhibits suggest a sharp conflict as to the legality of the seizure of exhibit 2, trial counsel did not move to suppress the evidence; rather, trial counsel objected to the introduction of the evidence at trial." *Ante* at p. 265, (footnote omitted). The majority dispose of Collinsworth's argument that exhibit 2 was improperly admitted, even though the evidence presented a question of the legality of the seizure of the exhibits, by stating:

"Trial counsel presented no reason as to why such a motion could not have been made prior to trial. A review of the exhibits and the affidavit for a search warrant without reference to the testi-

---

4. Collinsworth does not argue that phencyclidine hydrochloride is a form of phencyclidine which does not have a potential for abuse. This is, Collinsworth does not argue that the substance for which he is charged with delivery is a harmless drug. If

such argument was made, we would be forced to examine the statute in terms of the administrative law problems and/or the constitutional issues. See also, I.C. § 37–2745; *State v. Segovia*, 93 Idaho 208, 457 P.2d 905 (1969).

mony at trial, suggests factual conflicts which should have been apparent to counsel prior to trial and which should have been resolved by a hearing on a motion to suppress, not by a motion at trial. Thus, we conclude that the trial judge did not abuse his discretion when he denied the motion to suppress." *Ante* at p. 266.

I cannot agree with these statements, nor has the majority pointed out what these conflicts are. Counsel for one of Collinsworth's co-defendants made the following explanation for failing to make a motion to suppress prior to trial:

"Your Honor, at this time I would move the Court to suppress No. 1 through 4 on the ground and for the reason that evidence developed during the course of this trial comes as a surprise to counsel and that no motion to suppress could have been anticipated on the grounds of the inaccuracies stated in the affidavit in support of the search warrant. . . . I would move the Court at this time to suppress that evidence on the testimony that has been given and admissions by Officer Pruett that the affidavit in support of the search warrant was not accurate from what actually took place and also based upon the evidence that was given as to the way in which the entry was made in violation of Idaho statutes requiring that an officer not only knock but announce his presence and the purpose of his entry." (Rptr. Tr., pp. 150–151).

Trial counsel stated that evidence developed during the course of the trial came as a surprise to them and that they could not have earlier made a motion to suppress because they had first become aware of possible inaccuracies in the affidavit in support of the search warrant only after the trial began. Trial counsel very definitely presented a reason why such a motion could not have been made prior to trial.

The majority also say that a "review of the exhibits and the affidavit for a search warrant . . . suggests factual conflicts which should have been apparent to counsel prior to trial and which should have been resolved by a hearing on a motion to suppress, not by a motion at trial." This is not true with regard to exhibit 2. The affidavit for a search warrant, defendants' exhibit B, shows that Officer Pruett appeared before the magistrate at 12:55 a. m. on the morning of December 2, 1971, to obtain the search warrant, while the time listed on exhibit 2 itself shows it being logged in at 1:15 a. m. that morning. The times listed on exhibits 1, 3 and 4 show them logged in at 12:10 a. m. Thus, exhibit 2 and the affidavit for a search warrant do not suggest that exhibit 2 was seized without a warrant, although the times listed on exhibits 1, 3 and 4 show that they were seized without a warrant. However, Officer John L. Lyon of the Boise City Police Department Vice and Narcotics Squad gave the following testimony with regard to the search of the house and the seizure of items within it:

"Q. Did you participate in the search of the residence on that evening?

"A. Yes, I did.

"Q. What did you recover or observe recovered?

"A. I observed the items on the table and I observed Officer Marcum take these into evidence. I observed Detective Agent McCoy from the Attorney General's Office secure a bowl, kind of a wood bowl I believe with a plunger deal in it with some substance inside. I also observed Agent J. C. Pruett find a bank bag—a green bank bag which had substance in it in individual packages.

"Q. What did you do with these articles?

"A. I took these articles from the people who found them, they indicated by hollering they had found them and I would go to them and take the items, took it down to Detective

Marcum and he would take it into evidence." (Rptr. Tr., pp. 81–82).

This testimony indicates that the bank bag, which was contained in an upstairs cupboard, was seized at the same time as the other evidence, long before Pruett obtained a search warrant. This testimony conflicts with the testimony of Officer Pruett, who testified that exhibit 2 was not seized until he had returned from the magistrate's home with a search warrant. Trial counsel was surprised by this development and from examination of the exhibits could not have anticipated that there would be evidence to indicate that the bank bag was not seized pursuant to the search warrant. Neither the affidavit in support of the search warrant nor the notations on the exhibit itself gave any indication that exhibit 2 was not seized pursuant to the warrant; therefore, when testimony at trial indicated that there was some question concerning whether the exhibit was seized pursuant to a warrant, the trial judge abused his discretion by ruling that the motion to suppress had not been timely made and that the defendant had waived his rights to suppress the evidence. Given these circumstances, the trial court should have considered whether there was cause shown to grant relief from the waiver rather than denying the motion on grounds of untimeliness.

Collinsworth also argues that there is a gap in the evidentiary chain and that it was never proven that the item he sold to undercover Officer Pruett was the same item introduced as the state's exhibit 5. I believe there are two gaps in the evidentiary chain and that the state has failed to show that the item Collinsworth sold to Officer Pruett was the same item introduced as state's exhibit 5. First, the evidence is clear that the item Pruett purchased from Collinsworth was turned over to Officer Tom. L. Taylor. Taylor gave the following testimony concerning material he received from Officer Pruett:

"Q. What did you receive from Officer Pruett?

"A. The first item I received from Officer Pruett was I believe a bag of marijuana.

"Q. Did you receive anything else from Officer Pruett at this time?

"A. The second item I received was a small bag of a pinkish type substance that had been purchased out of a residence and was sold to him as—presented—

.    .    .    .    .    .

"Q. What did you do with this package after receiving it?

"A. I placed it into an Idaho Bureau of Narcotics envelope, sealed the same for deliverance to the safe in our office.

"Q. Did you have occasion to see that article again?

"A. No, I have not." (Rptr. Tr., pp. 70–71).

While he did indicate that he had prepared the envelope for delivery to the safe, Officer Taylor never testified that he took the item Officer Pruett had given him and returned it to the safe in the police department. On the contrary, he testified that he did not have occasion to see that article again. It is unclear what happened to the item; thus, this is the first break in the evidentiary chain. But, even if the item was taken to the safe, there is another gap in the chain.

The second gap occurs after Officer Taylor took what was purportedly the item Collinsworth had sold Pruett from the office safe to the state laboratory for testing. There was no testimony given at trial which showed that the item another officer, Robert Gholson, retrieved from the state laboratory, and which the evidence at trial indicates was the same item that was introduced as state's exhibit 5, was in fact the same item that Officer Taylor had taken to the laboratory. The majority says that a laboratory report, state's exhibit 6, provides the missing link. It is apparently the majority's contention that the laboratory report shows that the item Officer

Gholson retrieved from the laboratory was the same item that Pruett had given to Taylor. The laboratory report does not supply this missing link. The laboratory report contains a statement by the state's chemist that he analyzed the contents of an evidence envelope which contained the following description:

"On December 6, 1971 at 4:00 p. m., Detective Tom Taylor of Boise City-County Vice and Narcotic Squad delivered to this laboratory a sealed, standard Department of Health evidence envelope marked, 'Case No. 113–696 City Boise Date 12–1–71 Time 11:45 PM Agency Requesting Analysis City County Vice & Intelligence Defendant(s) 1: Orion Collingsworth 2: Thomas E. King Address 1032 Floral St Boise 2: 207 N. 17th # 2 Boise Charge Poss of Control Substance held for delivery (T.H.C.) Arresting Officers Taylor, Pruett, Marcum, Thompson, Heaton, McCoy Lyons Evidence, where found Sold to Agent JC Witnessed by Taylor, Marcum, McCoy, Lyons, Heaton, Thompson Evidence itemized 1 Plastic Baggie cont white powder Substance represented to be T. H.C. (Synthetic Grass)." (State's Exhibit 6).

But when Officer Taylor was asked what was written on the envelope in which he had placed the item that Pruett had given him, he gave the following testimony:

"The case number would have been written on the envelope, the name Orian Collinsworth was on the envelope, the date 12–1 of '72, the time was 11:36 PM that I received the envelope and the address, 1032 Floral Lane, Boise, Idaho, the charge sale of narcotics, the arresting officers were myself, Officer McCoy and Officer J. C. Pruett." (Rptr. Tr., p. 72).

Taylor's testimony concerning what was written on the envelope contrasts with the description of the envelope contained in the laboratory report: the times differ and the arresting officers differ. Thus, this laboratory report cannot be the missing link tying the item Pruett gave Taylor and the item Gholson retrieved from the state laboratory. Therefore, the state failed to establish a chain of evidence linking exhibit 5 with Orian Collinsworth and a conviction based upon this exhibit cannot be sustained. I believe that exhibit 5 was inadmissible.

The only other evidence upon which the conviction in Count I may be sustained is that pertaining to exhibit 2. Assuming arguendo that exhibit 2, the bank bag containing baggies, is in fact admissible, the question becomes whether the conviction can be sustained upon the chemist's testimony that these baggies contained a controlled substance. I think not. Collinsworth was not charged with possession of the controlled substance phencyclidine; he was charged with delivery of the controlled substance phencyclidine. If he possessed baggies containing a controlled substance, that is not proof that the baggie he delivered contained a controlled substance. Indeed, the state's expert witness, in discussing why he had mixed the contents of three of the nine baggies contained in the bank bag to analyze the contents of the baggies, gave the following explanation for this procedure:

"[T]hese things are clandestine because sometimes one baggie will be essentially zero and the other one will have twice the amount it is supposed to . . . . " (Rptr. Tr., p. 211).

Thus, the state's own witness testified that it is not uncommon for one baggie among many to contain "essentially zero," i. e., none of a controlled substance, while another will contain twice the amount it is supposed to. Thus, if the bank bag contained baggies which contained the controlled substance, the testimony of the state's own expert witness shows that this is no guarantee that the baggie delivered to Officer Pruett also contained the controlled substance. Because the charge brought against Collinsworth was delivery of the controlled substance, it was an essential element of the state's case to prove

that the baggie Collinsworth delivered to Pruett contained the controlled substance. In light of the testimony of the state's expert witness that the fact that one baggie in a batch containing a controlled substance is no guarantee that another also does, the burden of proof that the baggie delivered contained a controlled substance cannot be sustained by evidence that the other baggies which were not delivered contained a controlled substance, if indeed they did contain a controlled substance.

Even if these evidentiary matters are ignored and it is assumed for the sake of discussion for the remainder of this dissent that exhibits 2 and 5 were properly admitted, that does not mean that the state proved its case. There are two reasons for this: first, Collinsworth was charged with delivery of the controlled substance phencyclidine, but the testimony of the state's expert witness indicated that he delivered the substance phencyclidine hydrochloride. There is a material variance between the charge and the evidence, and therefore no conviction can be sustained on that count. *People v. Williams*, 27 Cal.2d 220, 163 P.2d 692 (1945); *see State v. Love*, 76 Idaho 378, 283 P.2d 925 (1955). *See also State v. Bollander*, 110 Ariz. 84, 515 P.2d 329 (1973).

However, even assuming for pleading purposes that charging a defendant with delivery of the controlled substance phencyclidine and proving the delivery of a different substance—phencyclidine hydrochloride—is not a material variance, the state has nevertheless failed to prove that phensyclidine hydrochloride is a controlled substance.

First, the state's expert witness never testified that phencyclidine was present in the substances he analyzed. He always referred to the substance he found as phencyclidine hydrochloride. There was no basis upon which the jury could conclude that Collinsworth delivered phencyclidine when the state's expert witness testified that he found phencyclidine hydrochloride in the state's exhibits; the jury must con-

sider phencyclidine and phencyclidine hydrochloride to be distinct substances so long as they are distinctly named, and thus there was no evidence introduced upon which a conviction for delivery of the controlled substance phencyclidine could be sustained.

Even if it is assumed that Collinsworth was charged with delivery of the substance phencyclidine hydrochloride, the state never proved that phencyclidine hydrochloride was a controlled substance. The Uniform Controlled Substances Act explicitly declares phencyclidine to be a controlled substance; it nowhere explicitly refers to phencyclidine hydrochloride. However, the Act does provide as follows:

"37–2709. SCHEDULE III.—(a) The controlled substances listed in this section are included in schedule III.

. . . . . .

"(c) Unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a potential for abuse associated with a depressant effect on the central nervous system;

. . . . . .

"(7) Phencyclidine;
. . ."

The majority says that phencyclidine hydrochloride is a controlled substance because (1) "[a]ll the statute requires . . . is that the state prove that Collinsworth delivered a substance which contains a drug which the legislature or the Board of Pharmacy has determined to be a substance 'having a potential for abuse associated with a depressant effect on the central nervous sytem,'" and that "[t]he evidence indicates that Collinsworth delivered phencyclidine hydrochloride and that phencyclidine hydrochloride is a substance containing phencyclidine." There is no evidence to support these assumptions.

With regard to the latter, the state need not merely prove that a substance contains phencyclidine for that substance to have

been legislatively determined to be a controlled substance. I.C. § 37–2709(c) requires the state to prove that a substance containing a § 37–2709(c) controlled substance such as phencyclidine must be a "material, compound, mixture, or preparation" of the substance listed in that section. "Material, compound, mixture, or preparation" are technical, chemical terms and the fact that the substance may contain another substance does not mean that the former is a "material, compound, mixture, or preparation" of the latter. For example, concrete contains water, but I very much doubt that concrete would be described as a "material, compound, mixture, or preparation" of water. The state's expert witness never testified that phencyclidine hydrochloride was a "material, compound, mixture, or preparation" of phencyclidine, and there is no basis upon which the jury could have so concluded. And there is absolutely no evidence to support the majority's conclusion "that phencyclidine hydrochloride is a substance containing phencyclidine."

Finally, assuming that there had been expert testimony that phencyclidine hydrochloride is a material, compound, mixture or preparation of phencyclidine, I do not believe that merely because a substance is a "material, compound, mixture, or preparation" of a schedule III controlled substance that such a compound itself is necessarily a schedule III controlled substance. In such a case the state must prove that the material, compound, mixture or preparation of the schedule III controlled substance has a "potential for abuse associated with a depressant effect on the central nervous system" in order to show that the compound is itself a schedule III controlled substance. The fact that a substance is

harmful does not necessarily mean that all of its compounds are harmful, e. g., the harmful gas chlorine when combined with sodium becomes the relatively harmless compound of table salt. Thus, it is by no means apparent that phencyclidine hydrochloric is a substance having a potential for abuse merely because phencyclidine, which the majority assumes is one of its components, has been determined to have a potential for abuse. Accordingly, proof of such "potential for abuse" is necessary in order to establish that a "material, compound, mixture, or preparation" of any substance listed in I.C. § 37–2709(c) is a controlled substance included within schedule III. The critical language of § 37–2709 which leads to this conclusion follows:

"37–2709. SCHEDULE III.—(a) The controlled substances listed in this section are included in schedule III.

. . . . . .

"(c) Unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances *having a potential for abuse associated with a depressant effect on the central nervous system*: . . ." (Emphasis supplied).

The phrase "having a potential for abuse associated with a depressant effect on the central nervous system" would appear to refer to and modify the words "material, compound, mixture, or preparation" rather than the word "substances" since the substances in question have already been legislatively determined to be schedule III controlled substances, and subsection (c) only concerns itself with whether or not the mixture or compounding of the controlled substance with other matters renders the mixture or compound to also be a controlled substance.[1]

---

[1]. This analysis of subsection (c) is supported by I.C. § 37–2709(f), which gives the State Board of Pharmacy authority to remove any compound, mixture or preparation of any of the substances determined by the legislature to be schedule III controlled substances in I.C. § 37–2709(c) "if the compound, mixture, or preparation contains one or more active me-

dicinal ingredients not having a stimulant or depressant effect on the central nervous system, and if the admixtures are included therein in combinations, quantity, proportion, or concentration that *vitiate the potential for abuse* of the substances which have a stimulant or depressant effect on the central nervous system." (Emphasis supplied).

I therefore conclude that where the Pharmacy Board has not previously listed phencyclidine hydrochloride in schedule III, a proper construction of I.C. § 37–2709(c) requires the state to prove that phencyclidine hydrochloride is a "material, compound, mixture, or preparation" of phencyclidine "having a potential for abuse associated with a depressant effect on the central nervous system" in order to show that phencyclidine hydrochloride is a controlled substance under schedule III.[2] Without the introduction of expert testimony on the matter of whether phencyclidine hydrochloride may have a depressant effect on the central nervous system and, if so, whether there is a potential for abuse associated with that effect, judges and jurors, who are laymen in the fields of chemistry and pharmacy, have no basis upon which to determine whether phencyclidine hydrochloride is a schedule III drug.[3] In my opinion, a conviction not based on such expert testimony should be set aside.

Accordingly, because the state introduced no evidence upon which a conviction for delivery of a controlled substance in Count I could be upheld, and because even if the improperly admitted exhibits are considered, the state has failed to prove that the exhibits contained the substance that Collinsworth was accused of delivering, or if they did, that this substance was a controlled substance, I would set aside the conviction for Count I.

Subsection (f) recognizes that compounding or mixing of controlled substances described in I.C. § 37–2709(c) with other ingredients may "vitiate the potential for abuse of the substances" and that therefore the Board may by rule except any such compound or mixture from schedule III. Thus, even though the legislature has specifically provided in I.C. § 37–2709(c) that compounds of phencyclidine having a potential for abuse are controlled substances, it has also provided in I.C. § 37–2709(f) that the Board may remove any compound or mixture of phencyclidine from the schedule if it determines that the compounding has "vitiate[d] the potential for abuse of . . . [phencyclidine]." Also, I.C. § 37–2702 authorizes the Board to add substances to the schedules under procedures established in title 67, chapter 52, Idaho Code, "if it finds the substance has a potential for abuse." I.C. § 37–2702(b). I.C. § 37–2708 sets forth the standards for adding a substance to schedule III, including that "abuse of the substance may lead to moderate to low physical dependence or high psychological dependence." I.C. § 37–2708(c). This further confirms the conclusion that compounds of the substances described in I.C. § 37–2709(c) are controlled substances only if it is demonstrated that such compounds have "a potential for abuse associated with a depressant effect on the central nervous system."

2. This does not mean, however, that if pursuant to the authority granted to it under I.C. §§ 37–2702, –04, –06, –08, –10 and –12, the State Board of Pharmacy adds phencyclidine hydrochloride to the list of controlled substances that proof of potential for abuse is necessary. If phencyclidine hydrochloride is explicitly included within the controlled substances by the Board acting pursuant to its authority, the question of whether it is described by I.C. § 37–2709(c) would become moot.

3. Meyers, Review of Medical Pharmacology (3d Ed. 1972), refers to phencyclidine, the chemical structure of which is more accurately described as phenyl-cyclohexyl-piperidine $(C_6H_5\cdot C_6H_{11}\cdot(NH\ C_5H_{10}))$, which is also known as PCP and is sold as a veterinary tranquilizer under the name Serylan, as "an agent used in veterinary practice to immobilize primates and a drug commonly, if illegally, used by ingestion or smoking to produce euphoria and a fantasizing state." At 194. The text does not refer, however, to any compounds of phencyclidine, such as phencyclidine hydrochloride, or describe whether such compounds have a similar effect upon the nervous system. This textbook, and the other reference works we have examined, such as Hackh, Chemical Dictionary (4th Ed. 1969), do not refer to the compound phencyclidine hydrochloride, or any other compounds of phencyclidine. Although one of the issues in this case is whether it was proven to the jury that phencyclidine hydrochloride has a potential for abuse associated with a depressant effect on the central nervous system, not whether we may ascertain this fact by examination of various pharmacy and chemistry reference works, an examination of these works indicates that one unschooled in chemistry or pharmacy, even with access to reference works in the field, cannot easily ascertain the answer to this question and that expert testimony on the issue is essential.