630 P.2d 674

STATE of Idaho, Plaintiff-Respondent,

v.

Robin LePAGE, Defendant-Appellant.

No. 13010.

Supreme Court of Idaho.

June 25, 1981.

Michael K. Ferrin of Stufflebeam & Ferrin, Brian R. Goates, Blackfoot, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Deputy Atty. Gen., Boise, Thomas E. Moss, Sp. Deputy Atty. Gen., Blackfoot, for plaintiff-respondent.

BISTLINE, Justice.

Defendant-appellant Robin LePage was convicted of murder in the first degree and

sentenced to life in prison for the murder plus fifteen years for use of a firearm in its commission. In brief, the facts surrounding the crime are these. LePage, together with John Messinese, a juvenile, escaped from State Hospital South in Blackfoot on July 23, 1977. LePage apparently stole a pistol from a parked car soon after this escape. The two then came to a picnic area where several beer parties were underway. Le-Page became involved in a verbal altercation with the murder victim, Kurt Cornelison, although no violence occurred at that time. LePage and Messinese left the party some-time later. They then stole a pickup truck from the premises of a Blackfoot business, leaving town that night in the stolen pick-up.

According to the testimony of Messinese, they saw Cornelison hitchhiking a short dis-tance outside of Blackfoot. LePage yelled "there's that son-of-a-bitch," jumped out of the truck and killed Cornelison with a shot to the head. LePage placed Cornelison's body in the back of the truck and later disposed of it at a more remote location. There was evidence that the body was sexu-ally molested by LePage prior to throwing it out of the pickup.

LePage and Messinese subsequently abandoned the pickup in Idaho Falls and traveled into Montana in other stolen vehi-cles. LePage stole another handgun in Deer Lodge, Montana, where LePage and Messinese separated when approached by a police officer; LePage gave Messinese one of the handguns before leaving. Messinese immediately turned this handgun over to the police officer.

LePage traveled to Washington, where he worked on a ranch under an assumed name for approximately a week. He was arrested at this ranch and transported to the Whitman County jail in Colfax, Wash-ington. There LePage was given *Miranda* warnings, waived his rights and was inter-rogated by an FBI officer who had partici-pated in the arrest. Following this interro-gation, LePage was taken to a jail in Spo-kane, Washington. Several days later, LePage was interrogated in Spokane by two Bingham County detectives, officers Mecham and Summers. Prior to this inter-rogation he was given *Miranda* warnings and he signed a written waiver.

Four days later, officers Mecham and Summers transported LePage by car from Spokane to Blackfoot. LePage, after being given *Miranda* warnings, was again interro-gated during this trip. He was arraigned the day after arriving in Blackfoot, and an attorney was appointed. Prior to the pre-liminary hearing, however, a new attorney, Michael Ferrin, was appointed to represent LePage. Mr. Ferrin represented LePage throughout the trial and is his attorney on appeal. Ten days prior to trial, the state placed a paid informer in the cell next to LePage. Conversations between LePage and the paid informer were overheard by another inmate, Charles Thompson, who was in an adjacent cell. Thompson testified as a witness for the state at the trial about the conversation between LePage and the state agent. Defense counsel did not at this time object to Thompson's testimony. After his conviction, LePage's counsel moved for a judgment of acquittal or a new trial. It was alleged that Thompson and detective Summers had given perjured tes-timony as to the considerations offered to Thompson in exchange for testifying against LePage, and that the court erred in refusing to allow him to impeach their testi-mony with a tape recording of a conversa-tion between them. It was also argued that defense counsel had erred in not mov-ing to suppress the testimony of Thompson, that the court erred in admitting the testi-mony even though there was no objection, and that LePage's right to counsel and right against self-incrimination were there-by violated. The trial court denied the motions for acquittal and for new trial. Sentence was imposed. On appeal, LePage raises essentially the same issues which were presented to the trial court on the motion for judgment of acquittal or new trial.

The first issue presented is whether there has been a violation of LePage's right to the assistance of counsel under Article I,

§ 13 of the Idaho Constitution and the Sixth Amendment of the United States Constitution [1] and, if so, whether a new trial is required because of those violations.

## I.

■ As a preliminary matter, we note that the failure of LePage's counsel to object at trial to the admission of Thompson's testimony does not preclude our consideration of the merits of LePage's claim.

While ordinarily the failure to move to suppress evidence prior to trial pursuant to I.C.R. 12(b)(3), and the failure to object to its admission at trial, would prevent us from addressing the issue on appeal, *see State v. Collinsworth*, 96 Idaho 910, 539 P.2d 263 (1975), "where a fundamental error has been committed in a criminal trial, this Court may consider it even though no objection was made in the trial court." *State v. Cariaga*, 95 Idaho 900, 903, 523 P.2d 32, 35 (1974). *See State v. Taylor*, 100 Idaho 105, 593 P.2d 1390 (1979); *State v. White*, 97 Idaho 708, 714 n.8, 551 P.2d 1344, 1350 n.8, cert. denied 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976); *State v. Swenor*, 96 Idaho 327, 333, 528 P.2d 671, 677 (1974) (Bakes, J., dissenting); *State v. Haggard*, 94 Idaho 249, 486 P.2d 260 (1971).

The state argues that the error here is not fundamental in the sense that admission of the evidence affected the "fairness" of the trial, because the statements which Thompson overheard and testified to were made voluntarily, were reliable, and therefore their admission did not affect the factual accuracy of the verdict. The state argues that since the exclusionary rule was intended to deter police conduct, and does not represent any *personal* right of defendants, its invocation may be waived. In essence, the state asks us to hold that incriminatory statements obtained in violation of a

defendant's Sixth Amendment right to counsel and the rule in *Massiah* [2] are to be treated no differently than inculpatory evidence seized in violation of the Fourth Amendment. *See State v. Gerhardt*, 97 Idaho 603, 605, 549 P.2d 262, 264 (1976) (trial court properly exercised discretion in holding that motion to suppress wallet was not timely made); *United States v. Mauro*, 507 F.2d 802 (2d Cir. 1974), cert. denied 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975) (failure to move to suppress evidence seized in warrantless search prior to trial precluded objection to introduction of evidence at trial); *United States v. Grant*, 462 F.2d 28 (2d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972) (objections to legality of electronic surveillance waived when not raised until after trial); *United States v. Evans*, 320 F.2d 482 (6th Cir. 1963) (failure to object at trial to lack of probable cause for search warrant precluded consideration on appeal); *Rasmussen v. Tahash*, 272 Minn. 539, 141 N.W.2d 3 (1965) (defendant waived right to object to introduction of confession by not requesting hearing on voluntariness of confession).

We need not determine whether there is a distinction between Fourth Amendment and Sixth Amendment rights for purposes of the exclusionary rule and waivers thereof. This Court has the inherent power to review alleged errors despite the lack of an objection below. *State v. Cariaga, supra*; *State v. Haggard, supra*. We choose to exercise our discretion to review the error presented here for three reasons.

First, we cannot agree with the state that the evidence of LePage's inculpatory statements is necessarily reliable and voluntary. The statements were made after having been incarcerated for some five months and during conversations with, if not interrogation by, an informant whose job it was to

1. Article I, § 13 of the Idaho Constitution provides in part that "[i]n all criminal prosecutions, the party accused shall have the right ... to appear and defend in person and with counsel." The Sixth Amendment to the United States Constitution provides in part that "[i]n

all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense."

2. *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

elicit such statements.[3] As the Supreme Court noted in *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), there are "powerful psychological inducements to reach for aid when a person is in confinement," and "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover government agents." *Id.* 100 S.Ct. at 2188. This fact rebuts the state's foundational premise—that LePage's statements were unquestionably voluntary and trustworthy, and hence could not have impinged upon his right to "receive a fair trial." *State v. Haggard*, 94 Idaho 249, 251, 486 P.2d 260, 262 (1971). This also distinguishes this case from Fourth Amendment waiver cases, where evidence is ordinarily non-testimonial and more inherently reliable. Anytime a *Massiah* violation occurs, at least in a custodial setting, the validity of the evidence produced will be suspect.

■ Secondly, if any waiver occurred here, it was on the part of LePage's counsel, not LePage himself. While ordinarily a client is bound by his attorney's actions, *see Silver Bowl, Inc. v. Equity Metals, Inc.*, 93 Idaho 487, 464 P.2d 926 (1970), an attorney may not waive a "fundamental" right of a client without the client's informed consent. *See Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966). *In Bement v. State*, 91 Idaho 388, 395, 422 P.2d 55, 62 (1966), the Court stated that:

> "The right to counsel, 'the most pervasive right of an accused,' has been accorded singular significance by federal courts. So important is the right, and so strong the presumption against its waiver, that a trial judge's clear and recorded statement of the right to an accused felon before inquiring whether the accused wishes to 'waive' the right, followed by the accused's immediate affirmative 'waiver,' will not necessarily compel a finding of intelligent waiver." (Footnote omitted.)

■ *Bement* is indicative of the importance which our judicial system has at-

tached to the right to counsel. Where a violation of that right is alleged on appeal and where, as here, there appears to be some merit to the allegation, the need for efficiency in the judicial process must give way to our primary duty to protect and preserve the basic rights accorded each citizen by the Constitution. We agree with the statement in *Solomon v. United States*, 408 F.2d 1306, 1309 (D.C. Cir. 1969), made in response to an argument that failure to object at trial to evidence obtained in violation of the right to counsel at a post-indictment lineup waived the right to object on appeal, that:

> "Rule 52(b), Fed.R.Crim.P., requires us to exercise our discretion whether to notice '[p]lain errors or defects affecting substantial rights' even when no objection is made at trial. Improper identification procedures may violate constitutional rights, and it is difficult for us to conclude that these rights are not 'substantial.' Further, we are reluctant to penalize defendants for the mistakes of their counsel, *who are often appointed by this court*, and *who often have little experience in criminal litigation.*" (Emphasis added.)

Here, not only was counsel appointed, but he has frankly admitted his ignorance of the *Massiah* rule at the time of trial and has made his competency an issue on appeal.

Finally, we are cognizant of the need to insure that the judiciary does function, and is perceived as functioning, in a manner consistent with the individual constitutional rights, both state and federal, of all who appear before the bar of justice. While the primary purpose of the exclusionary rule is undoubtedly to deter police misconduct, it is also true that at some point the courts must simply refuse to countenance certain behavior on the part of law enforcement agencies. "Courts ... cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered use of the fruits of such invasions." *Terry v. Ohio*, 392 U.S. 1, 13, 88

---

**3.** The informant, one "J. W.," was paid $75 (plus room and board).

S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968). While "the imperative of judicial integrity," *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960), may not be the primary reason for refusing to allow the use of unconstitutionally seized evidence at trial, it certainly requires us to exercise our discretion to review alleged errors that affect substantial rights and are "plain" in the sense that it is evident that a mistake has occurred. Accordingly, we turn to an examination of the merits of LePage's claim.

## II.

▆ Since the decision in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), it has been clear that using an informant to deliberately elicit post-indictment incriminating statements from a criminal defendant in the absence of the defendant's counsel is a violation of the Sixth Amendment. *See United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In an attempt to take this case out of the *Massiah* rule, the state argues in its brief that it is unclear from the record whether the informant here actually initiated any of the conversations with LePage which resulted in LePage making the incriminating statements which were used against him at trial.[4] From this, the state would have us conclude that Le-Page's statements were not "deliberately" elicited, and hence were voluntary and outside the *Massiah* rule. We note that the state admits that the informant did in fact question LePage about the crime; the state's argument rests solely upon the state's assertion that LePage may have initiated the conversations, and that the informant's questions were merely "following up" on information which LePage volunteered. *United States v. Henry, supra*, is dispositive of this argument.

In *Henry*, the facts were strikingly similar to the facts presented here. There a government informant was placed in a cell with the defendant Henry, and instructed not to question Henry about the charges against him or initiate any conversations about the charges. In short, the informant was instructed merely to keep his ears open. In deciding that testimony about Henry's jail cell conversations was nevertheless inadmissible, the Court relied on three factors:

> "First, [the informant] was acting under instructions as a paid informant for the government; second [the informant] was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by [the informant]." *Id.* 100 S.Ct. at 2186.

In the case of LePage, these three factors are even more compelling than in *Henry*. First, the record clearly shows that the informant placed in the cell next to LePage was paid a fee for reporting his conversations with LePage. Unlike *Henry*, where it was unclear whether the informant was deliberately placed in Henry's cell, it is clear here that the government deliberately placed the informant next to LePage for the purpose of eliciting evidence to be used against LePage. Second, LePage was unaware that the informant was a tool of the state; the informant was "ostensibly no more than a fellow inmate . . . ." Finally, LePage was not only in custody and under indictment at the time that he was engaged in conversation by the informant; he had been arraigned, had been given his preliminary hearing, had been given a court-appointed attorney and had been in jail for approximately five months. LePage was neither informed that the person to whom he was speaking was an agent for the state nor given the opportunity to contact his attorney prior to the conversation. The words of the Court in *Massiah* are particularly appropriate here: " '[I]f such a rule [that defendants must be allowed to have counsel present during post-indictment questioning] is to have any efficacy it must apply to indirect and surreptitious interro-

---

4. At oral argument, the state conceded that there had been a *Massiah* violation. To provide guidance to both the state and defendants in future cases, however, we address the argument set forth in the brief. See also part IV of this opinion.

gations as well as those conducted in the jailhouse. In this case, Massiah was more seriously imposed upon * * * because he did not even know that he was under interrogation by a government agent.' " 377 U.S. at 206, 84 S.Ct. at 1203 (quoting Judge Hays' dissent in *United States v. Massiah*, 307 F.2d 62, 72–73 (2d Cir. 1962). We find that the state violated LePage's right to counsel under both Article I, § 13 of the Idaho Constitution and the Sixth Amendment to the United States Constitution.

### III.

Having concluded that the conduct of the state was unconstitutional, we turn to an examination of the state's claim that the admission of LePage's statements made during this surreptitious interrogation was harmless error.

■ The standard for determining whether error of constitutional dimension is "harmless," as set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), is "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. at 828. Although the constitutional right infringed in *Chapman* was the Fifth Amendment right to remain

silent, the harmless error standard in *Chapman* is clearly applicable to claimed violations of the other constitutional rights, including the Sixth Amendment's guarantee of the assistance of counsel. *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). *See e. g., State v. Sharp*, 101 Idaho 498, 507, 616 P.2d 1034, 1043 (1980) (*Chapman* rule applied to prosecutorial misconduct). The Court in *Holloway* stated:

"Moreover, this Court has concluded that the assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' ... Accordingly, when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic." 435 U.S. at 489, 98 S.Ct. at 1181 (citations omitted).

While we do not understand the Court in *Holloway* to be saying that an automatic reversal will result in every instance of a *Massiah*-type violation,[5] it cannot be denied that such a violation places upon the state the burden of proving beyond a reasonable doubt that the tainted evidence did not "contribute" to the defendant's conviction.

---

**5.** In *Holloway*, the Court concluded that an admitted conflict of interests on the part of the defendant's attorney deprived the defendant of assistance of counsel during the entire course of the trial; it was in this context that the automatic reversal language was used. That an automatic reversal rule does not necessarily apply to the introduction at trial of evidence obtained as the result of a *Massiah* violation is evidenced by the Court's subsequent observation that "[i]n the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury." 435 U.S. at 490, 98 S.Ct. at 1181. The Court went on to note that "in a case of joint representation of conflicting interests the evil ... is in what the advocate finds himself compelled to *refrain* from doing ...." *Id.*

As noted in *United States v. DeCoster*, 624 F.2d 196 (D.C. Cir. 1979):

"An identification of an unrepresented suspect at a pretrial lineup is legally inadmissible, as is an in-court identification attributable only to the lineup, but the use of such an identification does not necessitate reversal if the Government proves its harmlessness beyond a reasonable doubt. The admission into evidence of a voluntary confession taken from an uncounselled arrestee without constitutionally-required warnings, or out of the presence of counsel after his appointment, may similarly be cured, in both instances, if the error is discrete and its adverse effects measurable. Want of counsel at some other pretrial proceedings—preliminary hearing, arraignment, entry of a not-guilty plea—or even during short periods of the trial itself may be found to be harmless. In each situation, by reason of the nature of the proceeding or the brevity of counsel's absence, the range of possible negative consequences is limited and possibly amenable to evaluation." *Id.* at 257 (Robinson, J., concurring) (footnotes omitted).

*Chapman, supra* 386 U.S. at 26, 87 S.Ct. at 829. *See State v. Smoot,* 99 Idaho 855, 861, 590 P.2d 1001, 1007 (1978); *State v. Raine,* 93 Idaho 862, 864, 477 P.2d 104, 106 (1970). Accordingly, we turn to an examination of the state's attempt to prove, beyond a reasonable doubt, that the tainted evidence did not contribute to the jury's verdict. Our starting point in this examination is the evidence itself.

The evidence complained of was introduced through the testimony of Charles Thompson, who overheard the conversation between LePage and the state's paid informant. Thompson testified in relevant part:

"Q. Mostly who was the conversation between, then?

"A. Robin and J.W.

"Q. To the best of your memory, please, tell the jury what you heard.

"A. Heard him talking about washing a truck.

"Q. Who said something about washing a truck?

"A. Well, he was reading about—in his transcript that where they took the body, but he was reading this part.

"Q. Who was reading this part?

"A. Robin LePage.

"Q. How did you know it was Robin?

"A. Because I know his voice. I've seen him.

"Q. You say he was reading a transcript?

"A. Yes.

"Q. What transcript was that, to your knowledge?

"A. Things that John Messinese had said.

. . . .

"Q. Continue on with what was said or done.

"A. Well, he was talking about what the transcript said and then he stopped, and J. W. goes, 'Don't tell me you were stupid. You didn't wash the truck?'

"And then he goes, 'Oh, yeah, I washed the truck.'

"Q. Do you recall anything else?

"A. Yes.

"Q. What was that, please?

"A. What—what he was arguing with this—I think the name's Kurt Cornelison.

"Q. What do you recall about this argument of Kurt Cornelison?

"A. Well, he said that he couldn't talk too much because the walls had ears, but J. W. asked him, he goes, 'Well, what was it over?'

"And Robin said, 'Drugs.'

"And then J. W. goes, 'You mean you don't like drugs? You don't like dope?'

"And he goes, 'I didn't say that.'

"And then J. W. asked him a—he goes, 'Well, what do you mean?'

"He goes he still couldn't talk because the walls had ears. But he said that he got burned on some drugs or something.

"Q. Who said he got burned on some drugs?

"A. Well, J. W. was asking questions, and he was just answering them with 'Yeah. Yeah. That's how it went.' And he said he was—that he bought something.

"Q. Excuse me. Mr. Thompson, I am having trouble following when you say 'He said' and—

"A. Okay.

"Q. Try to describe who was talking, please.

"A. Robin—Well, okay. J. W. asked him if he had bought something, and he said, 'Yes.' And then he asked—J. W. asked—if he got burnt, and he said, 'yes.'

"Then he said—J. W. asked if that's what the argument was about, and he said, 'Yes.'

"Q. This argument—did you understand the argument to be between Kurt Cornelison and Robin LePage?

"A. Yes.

. . . .

"Q. BY MR. SORENSEN: Mr. Thompson, do you recall anything else being said during this conversation?

"A. Yes. J. W. asked Robin LePage why—first he asked him, he goes, 'You were right by a river weren't you?'

"Robin goes, 'Yeah, there was a river around there.

"And then J. W. goes, 'Well, why in the hell didn't you throw the body in the river?'

"And Robin goes, 'That's where I slipped up. I hadn't slept in a couple of days. I was tired and I slipped up.'

"Q. What else, if anything, do you recall from the conversation?

"A. J. W. asked why he was hanging around with a little kid and why he had left the kid to be a witness. And Robin goes, 'Well, I just made a mistake. I didn't pull the trigger enough,' and he had planned on getting rid of John Messinese—

. . . .

"THE WITNESS: Robin LePage said that he planned on getting rid of the witness, John Messinese; that he was going to in a couple of occasions, but things like people turning up, other people, witnesses, other people that he had known, just people that happened to come by turned up and he couldn't do it."

This testimony, all of which was obtained in violation of LePage's right to counsel, is unquestionably highly damaging. Were it not for other evidence introduced against LePage, we would be compelled to reverse.

▌ This Court has held, however, in applying the "harmless error" rule, that where the admissible evidence provides, beyond a reasonable doubt, "overwhelming and conclusive" proof of a defendant's guilt,

the admission of tainted evidence will be held to be harmless error. *State v. Garcia*, 100 Idaho 108, 111, 594 P.2d 146, 149 (1979); *State v. Smoot*, 99 Idaho 855, 861, 590 P.2d 1001, 1007 (1978).[6]

▌ In this case the state, in addition to the tainted evidence, provided the following admissible and relevant evidence that LePage committed the murder: (1) testimony of John Messinese, an eyewitness, who stated that LePage had committed the crime and gave details surrounding its commission, details which were corroborated by independent evidence, (2) testimony of an FBI expert linking fibers found on Cornelison's clothing with a blanket found in the back of the pickup which LePage had admittedly stolen on the day of the murder, (3) statements of LePage following his arrest indicating knowledge that Cornelison's body had been sexually assaulted, although this fact had been withheld by the police prior to questioning, (4) statements of LePage following his arrest professing both dexterity in the use of handguns and an ability to destroy his fingerprints so that he could not be connected with this particular crime, (5) the statement of LePage following his arrest, and after being informed that the police were in possession of the murder weapon, that "[y]ou don't have the gun that killed the man if you took it from John,"[7] (6) testimony of the interviewing

---

**6.** We note that in *Chapman* the Supreme Court declared itself as declining to follow the "overwhelming evidence" test which had been applied by the California Supreme Court in that case. 386 U.S. at 23 n.7, 87 S.Ct. at 827 n.7 and accompanying text. However, in applying *Chapman* virtually all courts, including the United States Supreme Court itself, have looked to the nature and extent of the non-tainted evidence in determining whether error was harmful or harmless. *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *United States v. Cornejo*, 598 F.2d 554, 557 (9th Cir. 1979); *United States v. Milhollan*, 599 F.2d 518, 524 (3d Cir. 1979); *People v. Zamora*, 28 Cal.3d 88, 167 Cal.Rptr. 573, 615 P.2d 1361, 1370 (Cal. 1980); *People v. Meyers*, 617 P.2d 808, 815 (Colo. 1980); *Simons v. State*, 389 So.2d 262, 265–66 (Fla.App. 1980). Such point of view

undoubtedly reflects judicial cognizance of the obvious fact that a jury is not going to simply ignore relevant and competent evidence. Where properly admitted evidence is overwhelming as to guilt, an appellate court may yet conclude beyond a reasonable doubt that the evidence improperly admitted insufficiently contributed to the jury's verdict so as to require a second trial.

The language we adopt *infra* will be observed as not unlike that of Chief Justice Burger, writing for the majority in *Milton v. Wainwright, supra*, 407 U.S. at 378, 92 S.Ct. at 2178, that "[o]ur review of the record . . . leaves us with no reasonable doubt that the jury . . . would have reached the same verdict without hearing [an informant's] testimony."

**7.** This statement shows a belief that Messinese did not commit the crime. More importantly it implies some affirmative knowledge of the murder weapon.

officers that LePage's attitude became less "cocky" after being informed that the police had the murder weapon and that semen found in the victim's anal cavity could be traced using blood-typing techniques, and (7) testimony that Cornelison had a number of twenty dollar bills in his wallet on the day of the murder, that these bills were missing when his body was subsequently discovered, and that LePage, who did not have money prior to the crime, subsequently displayed a roll of bills which he claimed to have taken from the murder victim. Taken as a whole, the nontainted evidence in this case provides overwhelming proof of LePage's guilt.

While past cases have referred to the inquiry to be undertaken as whether tainted evidence has "contributed" to a guilty verdict, *see e. g., State v. Griffiths*, 101 Idaho 163, 167 n.1, 610 P.2d 522, 526 n.1 (1980); *State v. Smoot*, 99 Idaho 855, 861, 590 P.2d 1001, 1007 (1978); *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963), we believe that the use of this word merely confuses the true nature of the inquiry where a discrete piece of evidence is involved.[8] In this case it cannot be denied that the evidence of LePage's conversation with the state's informant was highly damaging and may have "contributed" to the jury's verdict; it would border on the absurd to say that the jury ignored it in arriving at their decision. As previously noted, however, this fact alone does not preclude an examination of the remaining evidence. Accordingly, we delineate the question to be answered for what it truly is: Is the appellate court convinced beyond a reasonable doubt that the same result would have been reached had the evidence been properly excluded?[9] We must answer this question in the affirmative; there can be no doubt but that,

**8.** Compare the majority and dissenting opinions in *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), and *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). *See* Comment, Confusion in the Court—Wisconsin's Harmless Error Rule in Criminal Appeals, 63 Marquette L.Rev. 643 (1980). We cannot help but acknowledge the views expressed in the vigorous four member dissent in *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), wherein Justice Stewart wrote:

"I can find no basis for the Court's holding today that the admission of Officer Langford's testimony was harmless. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, we said that an 'error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy* [*v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171], be conceived of as harmless.' 386 U.S. at 23–24, 87 S.Ct. at 828. And on the question of whether a jury might possibly have been influenced, the State must 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' *Id.* at 24, 87 S.Ct. at 828." 407 U.S. at 382–83, 92 S.Ct. at 2180–81.

He also wrote, in language which well illustrates that the factual situation there was such as that before us:

"[T]he ability of the petitioner to discredit in the minds of the jury the evidence of his prior statements was undoubtedly destroyed by the strong corroboration and elaboration supplied by the testimony of Officer Langford, who had been unconstitutionally planted in the petitioner's jail cell. Surely there is *at the least* a reasonable doubt whether in these circumstances the introduction of Langford's testimony did not contribute to the verdict of first-degree murder returned by the jury, particularly where a conviction for a lesser degree of homicide was a distinct possibility on the evidence." 407 U.S. at 384, 92 S.Ct. at 2181.

We have today more squarely faced the question than did the Supreme Court majority in that case by outright conceding that the improper testimony supplied by unconstitutionally planting an officer in the cell adjacent to LePage's *did* contribute to the verdict, but we have nevertheless applied the *Chapman* "harmless error rule" just as the Supreme Court did in *Wainwright*, on the basis of overwhelming and conclusive evidence.

**9.** We note that this question is to be posed only where evidence has been improperly admitted; where the error complained of affects the trial in a more general sense (for example, where a defendant's attorney has a conflict of interest but is forced by the trial court to represent the defendant anyway—*see Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), the proper inquiry is still whether the error "contributed" to the verdict, or, as the Supreme Court more recently put it, whether "the error materially affected the deliberations of the jury." *Id.* at 490, 98 S.Ct. at 1181. *See Hamling v. United States*, 418 U.S. 87, 109, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974).

even excluding the testimony of Thompson, LePage would have been convicted by any jury on the strength of the state's case. We note that LePage presented virtually no evidence, save his own protestations of innocence, in his defense. Thus we are not presented with a case such as *State v. Stewart*, 100 Idaho 185, 187, 595 P.2d 719, 721 (1979), where the evidence is in "testimonial equipoise" and the tainted evidence may have tilted the balance in favor of the state. Rather, we are faced with a situation where the state has constructed a most impressive case against the defendant, and the defendant on appeal has simply removed several bricks from the state's structure. The missing bricks, however, do not impair the integrity of the overall case. We are convinced beyond a reasonable doubt that even if the unconstitutionally obtained evidence had been properly excluded from the trial, the jury would have arrived at the same verdict. We so hold.

### IV.

Although we conclude that admission of the unconstitutionally obtained evidence in this case amounted to harmless error, we feel it necessary to add a word about the propriety of the police conduct which produced the evidence. *Massiah* was decided in 1964. Since that time, it has been clear, or should have been made clear, to law enforcement agencies that it is a violation of a defendant's constitutional rights to use an undercover agent to elicit post-indictment statements in the absence of counsel. Despite the clarity of the *Massiah* rule, it appears that some officers either have not been informed, or are willing to jeopardize the possible conviction of a criminally accused person by violating that person's constitutional rights in order to gain more evidence. Often, as in the case of LePage, the evidence so obtained is merely cumulative and unnecessary to the state's case. Overzealous police activity such as we encounter here is not all that different from coercing a confession or an illegal search.

The cautionary remarks of the Supreme Court in *Holloway* are worth remembering, where that Court said in its review of *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942):

"Second, the Court justified the reversal of Glasser's conviction, in part, by emphasizing the weakness of the Government's evidence against him; with guilt a close question, 'error, which under some circumstances *would not be ground for reversal,* cannot be brushed aside as immaterial, since there is a real chance that it might have provided the slight impetus which swung the scales toward guilt.' " 435 U.S. at 489, 98 S.Ct. at 1181.

In the case of LePage, although he had been incarcerated for some five months, it was not until ten days prior to his trial that the state placed an informer in the cell next to him. Furthermore, LePage had indicated that he did not wish to talk to law enforcement officers without an attorney present, and had been advised not to do so by his attorney. Such a flagrant attempt to elicit incriminating evidence without giving a defendant an opportunity to have counsel present may well in another case result in reversal and a second trial.

### V.

LePage's contention that the court improperly excluded evidence designed to impeach Thompson, while appearing to have merit, is necessarily disposed of by our finding that the admission of Thompson's testimony was harmless error. Hence we need not discuss it further. His other contention of a denial of effective assistance of counsel, based upon failure of counsel to move to suppress Thompson's testimony and failure to provide the court with the proper basis for admission of the impeaching evidence, is engulfed in and disposed of by our holding of harmless error [10] in admit-

---

10. Since *Chapman* it is necessary to envision "harmless error" as not restricted to meaning error that is merely not prejudicial, but also to envision "harmless error" as error which, though prejudicial, does not amount to reversible error, viewed within the *Chapman* rule.

ting Thompson's testimony. It is quite clear that LePage by his own actions and statements had been of great assistance to the prosecution in building a strong case against him prior to counsel coming into the case. With the testimony of an eyewitness to the murder, counsel, confronted with an awesome task, gave a commendable and creditable representation.

Judgment of conviction affirmed.

BAKES, C. J., and McFADDEN and DONALDSON, JJ., concur.

SHEPARD, J., concurs in result.

Similarly, since *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), it has become necessary to think not only in terms of malice, actual and implied, but in terms of constitutional malice.