714 P.2d 72

STATE of Idaho, Plaintiff-Respondent,

v.

Jesse E. SCROGGIE, Defendant-Appellant.

Jesse Earl SCROGGIE, Petitioner-Appellant,

v.

STATE of Idaho, Respondent.

Nos. 13790, 15754.

Court of Appeals of Idaho.

Jan. 30, 1986.

Fred R. Palmer, Sandpoint, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

WALTERS, Chief Judge.

In these consolidated appeals, Jesse Scroggie asks us to review a jury conviction for second degree murder and an order dismissing his application for post-conviction relief. Scroggie's appeal from the judgment of conviction was stayed while he petitioned for relief under the Uniform Post-Conviction Procedure Act. The application for post-conviction relief was summarily dismissed. On this consolidated appeal, Scroggie makes several contentions which may be summarized as follows: (1) the trial court committed fundamental error by permitting the defendant to be convicted without submitting the mental illness defense to the jury; (2) Scroggie was denied effective assistance of counsel when counsel failed to present the affirmative defense of mental illness and committed other deficiencies; (3) the trial court committed reversible error by failing to provide the jury with an instruction on the lesser crime of involuntary manslaughter; (4) the trial court improperly admitted hearsay evidence which prejudiced Scroggie's right to a fair trial; (5) the trial court abused its

sentencing discretion; and (6) the district court erroneously dismissed the application for post-conviction relief. We hold that reversible error occurred in Scroggie's trial when the defense of mental illness was not submitted to the jury. We therefore reverse the judgment of conviction, hold the district court erred in dismissing Scroggie's application for post-conviction relief, and we remand for a new trial.

Except as noted, Scroggie provided the following account of events leading to his shooting of A.W. Barron, the victim. After twenty-three years of marriage, Eileen Scroggie filed for divorce in September 1979. Eileen left the family residence in Bonners Ferry, Idaho and rented an apartment in Sandpoint, approximately thirty-six miles from Bonners Ferry.

Scroggie, who operated a combination used car lot, bar and retail gasoline sales enterprise, opened his business in Bonners Ferry the morning of November 13, 1979. With the exception of breaks for meals, he worked as bartender and drank beer during the day and evening. Before noon Scroggie received the first in a series of phone calls from Barron. Scroggie stated that, in this first call, Barron inquired if Scroggie had followed Eileen home earlier that morning. Scroggie testified that Barron then stated "I will find out if I have to choke it out of the bitch." Barron called again during the early evening and asked Scroggie whether he (Scroggie) had put a "hickey" on Eileen's neck. Scroggie further related that Barron then stated "he'd kill the guy that did it." Scroggie testified that he received yet another phone call from Barron that evening in which Barron stated, "The old lady has been raped and she is bad." Eileen then came on the line and Scroggie asked her in Portuguese whether there was "danger in the house." Her reply implied that she was not in danger but the conversation ended abruptly.

After closing his bar around midnight, Scroggie returned home and called Eileen in Sandpoint. Scroggie believed that Eileen was under the hypnotic control or spell of Barron. He testified he wanted to ascertain whether she needed any help. Her response was in the negative. Still not convinced that Eileen was safe, Scroggie called Rose Zieja (Scroggie's neighbor) and asked her to call Eileen. Although reluctant, Rose did call Eileen. Rose testified at trial that she was surprised when a man answered Eileen's telephone. Rose spoke to Eileen and inquired whether Eileen was safe. Again Eileen indicated that she was safe. Rose then called Scroggie and related that Eileen had said that she was "all right." Scroggie then asked Rose to drive to Sandpoint and bring Eileen back to Bonners Ferry. Rose refused and insinuated that Eileen was an adult and her apparent involvement with a man at this hour of the night was Eileen's own business. Rose essentially told Scroggie that he should leave well enough alone.

Undeterred, Scroggie then woke up his two sons, Steve and Paul (seventeen and eighteen years old respectively) and asked them to drive to Sandpoint to retrieve their mother. The boys indicated that they did not want to go alone so Scroggie agreed to accompany them. Scroggie and his sons stopped at the bar to fill a car with gasoline for the trip to Sandpoint. After filling the car with gas, Scroggie reentered the bar to turn off the gasoline pump. While in the bar, he obtained approximately $300 in cash and a .357 revolver. He placed the revolver and the money in his jacket pocket. He testified he took the money with him in case Eileen needed to be admitted to a hospital. At about 2:30 in the morning of November 14, Scroggie and his sons started to Sandpoint. Scroggie slept in the back seat of the car while Paul drove to Eileen's apartment.

Once they arrived, the boys testified that they went to Eileen's front door and knocked. Scroggie meanwhile went to a back patio sliding door. A neighbor in the adjoining apartment observed Scroggie peer into his window. Scroggie entered through the sliding glass door. He testified that Barron was seated at the kitchen table. Scroggie said he noticed Eileen's face appeared to have been beaten and her

nose was bleeding. She went into the adjoining living room to talk to her son. According to Scroggie, Barron then pushed the kitchen table away with his left hand, yelled "Jesse", and pointed a gun at Scroggie. Scroggie said he turned, pulled his revolver from his pocket, and shot Barron two or three times. After the shooting, Scroggie and his sons departed for Bonners Ferry with Paul driving. During the trip back, Scroggie asked Paul to stop the car. Scroggie got out of the car and threw his gun away. He then got back into the vehicle and the three returned to Bonners Ferry. The gun was not recovered.

Scroggie and his boys were arrested in Bonners Ferry as they pulled into their driveway. While handcuffed in the front passenger seat of the patrol car returning to Sandpoint, Scroggie opened the front door and attempted to jump from the vehicle while it was traveling approximately seventy miles per hour. The officer who was transporting Scroggie testified he told Scroggie that he would have shot Scroggie if he had jumped from the car. According to the officer, Scroggie responded by saying "that's what I wanted you to do."

At trial, Scroggie argued that he had acted either in self defense or in defense of others (i.e., Eileen). To support its theory of first degree murder, the state presented evidence that there were a total of seven bullets fired by Scroggie, although Scroggie testified he did not remember firing seven bullets. The state postulated that Scroggie would have had to reload his six-shot revolver to shoot the seventh bullet. After being granted transactional immunity, the boys testified that they did not see the shooting. Eileen declined to testify after invoking the marital privilege of refusing to testify against a spouse. I.C. § 19–3002. The jury was instructed that it could find Scroggie not guilty, guilty of first degree murder, guilty of second degree murder, or guilty of voluntary manslaughter. The jury found Scroggie guilty of second degree murder.

Scroggie was sentenced to an indeterminate term of thirty-five years for the murder plus a consecutive, indeterminate term not to exceed fifteen years for the use of a firearm in the commission of a crime, I.C. § 19–2520.[1] Scroggie's trial counsel[2] filed a notice of appeal. Scroggie also filed an application for post-conviction relief. This application was assigned to Judge Magnuson for disposition. The application relied on seven major issues to support post-conviction relief.[3] Scroggie moved for summary judgment on his application for post-conviction relief and the state countered with a motion for summary dismissal of the application. Judge Magnuson denied Scroggie's motion for summary judgment and granted the state's motion for dismissal. As noted, Scroggie's appeal of the denial of his post-conviction relief application has been consolidated with his direct appeal from his conviction.

I

Scroggie asserts that his conviction of second degree murder without the jury being able to consider his affirmative defense of mental illness was a fundamental error that requires reversal. This assertion

1. This sentence was commuted by the Idaho Commission for Pardons and Parole which ordered that the fifteen-year enhancement term run concurrently with the thirty-five year term for murder.

2. Scroggie's counsel on appeal is not the same attorney who represented him at trial.

3. These issues were: (1) "fundamental error of constitutional dimension" occurred when the court failed to submit the defense of mental defect or disease to the jury; (2) fundamental error occurred when the court failed to instruct the jury as to the elements of involuntary manslaughter; (3) the trial court made numerous improper evidentiary rulings; (4) Scroggie may have been denied his right to receive a fair trial because the jurors may have seen him manacled; (5) the trial court erred in not granting the defense's proposed jury instruction on justifiable homicide; (6) Scroggie was denied effective assistance of counsel as demonstrated by twelve examples of trial counsel's alleged ineffectiveness; and (7) the presentence investigation report failed to comply with I.C.R. 32(b)(10) because the report did not contain a suggested plan of rehabilitation as an alternative to incarceration.

serves as the foundation for several related claims. First, the trial court, prosecuting attorney, and defense counsel erroneously advised the psychiatrist on the legal standards necessary to invoke the affirmative defense. Based on this advice, the psychiatrist testified at trial that Scroggie's mental state did not rise to the level necessary to avail oneself of the affirmative defense. Second, the trial court did not instruct the jury on the affirmative defense of mental illness. Finally, Scroggie contends his right of effective assistance of counsel was denied by trial counsel's failure to properly interpret I.C. § 18–207, to present evidence in support of the affirmative defense, and to request a jury instruction on the mental illness defense.[4]

### A

The state refers to this issue as a "diminished capacity defense"[5] and insists no error occurred for two reasons. First, the state asserts that this issue was not preserved for appeal because of a "procedural default." Second, even if Scroggie's mental illness defense was preserved for review, the state contends that "diminished capacity" is not recognized as a mental illness defense in Idaho. We will discuss each of these threshold arguments in turn, before addressing Scroggie's position concerning the merits of his mental illness defense.

In respect to its theory of "procedural default," the state poses the following argument. Scroggie's contention that he was denied due process when his defense of mental illness was not presented is an issue which should be raised on direct appeal and not by way of an application for post-conviction relief. Therefore, dismissal of his post-conviction petition was appropriate. Having attempted to raise the issue in the post-conviction proceeding, Scroggie is now

"procedurally defaulted" from pursuing the same issue on the direct appeal.

■ We are not persuaded by the state's reasoning. The record before us clearly shows that the direct appeal was stayed pending determination of Scroggie's petition for post-conviction relief. A letter from the Clerk of the Supreme Court mentions that the Court ordered a stay of the direct appeal. Thus, the issue of mental illness was held in abeyance and not lost for failure to preserve. Further, because of the difficulties in examining a claim of ineffective assistance of counsel on direct appeal where the competency of counsel was not in issue at trial, we have recently suggested that a petition for post-conviction relief is the proper method of examining such a claim. *State v. Darbin,* 109 Idaho 516, 708 P.2d 921 (Ct.App.1985). *See also Carter v. State,* 108 Idaho 788, 702 P.2d 826 (1985); *State v. Carter,* 103 Idaho 917, 655 P.2d 434 (1981); *State v. Blackburn,* 99 Idaho 222, 579 P.2d 1205 (1978); *State v. Kraft,* 99 Idaho 214, 579 P.2d 1197 (1978). We hold that Scroggie has not been barred or "procedurally defaulted" from appellate review of the mental illness defense issue in these consolidated appeals.

■ Second, the state insists that the "diminished capacity defense" was explicitly rejected by our Supreme Court in *State v. White,* 93 Idaho 153, 159, 456 P.2d 797, 803 (1969). In *White,* the Court abandoned the M'Naghten Rule on criminal responsibility and adopted the American Law Institute (ALI) test for criminal responsibility. *Id.* at 158, 456 P.2d at 802. In selecting the ALI rule (later codified at I.C. § 18–207 (repealed 1982)), the Court rejected several other alternative proposals including the *Durham,*[6] irresistible impulse, and diminished responsibility rules. In explaining why it rejected the diminished responsibility rule, the Court stated:

---

4. Because we find the issue of mental illness dispositive, we need not decide whether Scroggie's trial counsel was ineffective except to note that his conduct does bear upon the mental illness issue.

5. Scroggie's brief refers to this issue as "diminished responsibility."

6. *Durham v. United States,* 214 F.2d 862, 874–75 (D.C.Cir.1954).

The theory of diminished responsibility is unsatisfactory for our purposes both because it is overbroad and because the consequences of its application are different. It is overbroad because it includes not only mental diseases or defects but any state which prevents the formation of *mens rea*, e.g., intoxication. Its consequence is not to exclude criminal responsibility, as would the application of the A.L.I. test, but simply to reduce the level of criminal responsibility.

93 Idaho at 159, 456 P.2d at 803 (footnote omitted).

We believe the state misses the thrust of Scroggie's contentions. While Scroggie characterizes his defense as one of "diminished responsibility," in reality he argues the ALI rule as set out in I.C. § 18–207, should have been used at his trial. He contends the jury should have been allowed to determine, in considering his conduct, whether he lacked "substantial capacity" to conform his conduct to the law.

We conclude that neither of the state's threshold arguments preclude our review of Scroggie's mental illness defense issue. We now turn to that issue on its merits.

B

The legislature enacted the ALI rule for criminal responsibility in 1972. 1972 Idaho Sess. Laws ch. 336, § 1. The ALI rule was "intended to serve the general purpose of making the criminal law fairer and more humane." Thomas, *Breaking the Stone Tablet: Criminal Law without the Insanity Defense*, 19 IDAHO L.REV. 239, 243 (1983). The rule as codified provided:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either

[a] to appreciate the wrongfulness of his conduct *or*

[b] to conform his conduct to the requirements of law.

I.C. § 18–207 (emphasis added).

The mental illness issue arises in a convoluted fashion. Following Scroggie's arraignment he served notice of his intent to rely on an affirmative defense of mental illness. I.C.R. 12(g)(2) (rescinded 1984). The district judge then ordered Scroggie to undergo a psychiatric examination to determine whether Scroggie was fit to stand trial. I.C. § 18–211. The psychiatrist (Dr. Edgren) concluded that Scroggie suffered from "depressive reaction, moderately severe with chronic alcoholism." Conforming to the reporting requirements of I.C. § 18–211, Dr. Edgren opined

that the defendent [sic] does have the capacity to understand the proceedings against him and to assist in his defense. It is also the examiner's opinion that the defendent [sic] does have the capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law.

At the time of the incident, in my opinion, the subject was intoxicated. The atmosphere in which the crime occurred was highly charged emotionally. Therefore, his *capacity was impaired at the time of the criminal charge.* [Compare emphasized portion in last sentence with the conclusion of the proceeding paragraph.]

Based on the psychiatrist's report and without objection from defense counsel, the court determined that Scroggie was fit to stand trial.

After finding Scroggie mentally fit to stand trial, the question of Scroggie's mental condition at the time of the shooting was subsequently discussed at an unrecorded pretrial conference. The pretrial order recites "[Scroggie's defense counsel] indicated that the defendant would not pursue his defense of mental illness or defect; however, he may call a psychiatrist as a witness and offer testimony pointing toward the question of intent of the defendant." After nine days of trial and after the defendant had taken the stand, Dr. Wetzler was called by the defense to testify as to Scroggie's ability to form the specific intent necessary for the murder conviction. Dr. Wetzler diagnosed Scroggie as suffering from four mental disorders—severe de-

pressive reaction, chronic alcoholism, brain concussion, and dissociated reaction. Once the disorders were established as mental diseases or defects, the doctor opined that Scroggie, nevertheless, could appreciate the wrongfulness of his conduct. *See supra* I.C. § 18–207(1)[a]. When asked about Scroggie's ability to conform his conduct to the law, the doctor testified that the mental diseases severely but not totally impaired Scroggie's ability to conform his conduct to the law. The doctor then surprised the court by concluding Scroggie's mental state did fall within the purview of the second part of I.C. § 18–207. *See supra* I.C. § 18–207(1)[b].

After the prosecutor began his cross-examination of the doctor, the court and counsel went off the record and retired to the judge's chambers. They returned and defense counsel again elicited from Dr. Wetzler that Scroggie's ability to conform his conduct to the law was impaired, but he did have *some* capacity to conform his conduct to the law. Outside the presence of the jury, the court then questioned Dr. Wetzler. The court advised Dr. Wetzler that "we don't have impaired or diminished capacity in Idaho as a defense." The doctor replied that Scroggie did lack the substantial capacity to conform his conduct to the law and, consequently, fell within the category of those who may raise the mental illness defense. Defense counsel agreed with the prosecutor that Scroggie did not fall under the mental defect statute because Scroggie did have "some" ability to conform his conduct to the law. The court apparently agreed with the prosecutor's conclusion that the insanity defense requires *total* incapacity. Fortified with this understanding of the statute, the court again questioned the doctor. Based on the understanding that the statute requires total incapacity, the doctor then testified the "statute does not fit in this case." By affidavit in support of Scroggie's application for post-conviction relief, Dr. Wetzler explained that this about-face

> was in no way based upon a change in my diagnosis of Jesse's mental state, but rather was based upon my impression,

based specifically upon the explanation of [the prosecutor], that I could not say Mr. Scroggie was within the meaning of the mental defense statute [I.C. § 18–207] unless his ability to conform his conduct to the law was *completely obliterated* as a result of mental disease or defect.... [Emphasis added.]

The district judge who reviewed Scroggie's application for post-conviction relief, found that "the defense waived its affirmative defense of mental disease or defect at the pretrial hearing." The judge further noted the trial court and defense counsel were not responsible for Dr. Wetzler's confusing testimony. Despite Dr. Wetzler's subsequent insistence that his testimony concerning the availability of the affirmative defense was based on the "total incapacity" interpretation, the court observed that Dr. Wetzler was an expert and "presumed to be knowledgeable about the form and nature of testimony he was called to give." The court concluded that "failure of the trial court to submit the defense of mental disease or defect to the jury was not error, because such defense had been previously abandoned."

On appeal to this Court, Scroggie asserts that I.C. § 18–207 does not require *total* incapacity, but only that the accused lacks *substantial* capacity to conform his conduct to the requirements of law. Because the judge, prosecutor, and defense counsel all acceded to the "total" incapacity interpretation, Scroggie maintains that Dr. Wetzler was improperly advised on the legal meaning of the statute. He maintains that the misinterpretation of the statute was a fundamental error which deprived him of due process.

## C

"[T]he obligation of the state to see that defendant receive a fair trial is primary and fundamental." *State v. Haggard*, 94 Idaho 249, 251, 486 P.2d 260, 262 (1971); *State v. Lute*, 108 Idaho 905, 702 P.2d 1365 (Ct.App.1985). A fundamental error which has deprived an accused of due

process may be considered on appeal even though no objection was made at trial. *State v. Rutherford,* 107 Idaho 910, 693 P.2d 1112 (Ct.App.1985). As we noted in *Rutherford,* fundamental error occurs "where a statement is made or an act is done which results in prejudicial error that goes to the heart of a party's case...." *Id.* at 915, 693 P.2d at 1117, *quoting United Farm Bureau Family Life Insurance Co. v. Fultz,* 176 Ind.App. 217, 375 N.E.2d 601, 611 (1978). A fundamental right may not be waived without the client's informed consent. *State v. LePage,* 102 Idaho 387, 630 P.2d 674, *cert. denied,* 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981). We find no indication in the record before us that Scroggie voluntarily and knowingly waived his right to present the affirmative defense of mental defect.

■ At the time of trial, I.C. §§ 18–207, –209 (repealed 1982) provided that mental illness was an affirmative defense which justified acquittal. *See State v. Storey,* 109 Idaho 993, 995 n. 1, 712 P.2d 694, 696 n. 1 (Ct.App.1985). To invoke the affirmative defense of mental illness, the accused must "lack substantial capacity" to conform his conduct to the law. In adopting the ALI rule, our Supreme Court noted in *State v. White* that negating criminal responsibility will only occur when the mental defect causes "a lack of 'substantial' capacity to conform." 93 Idaho at 160, 456 P.2d at 804 (emphasis original). In *White* the Court defined "lacks substantial capacity" as "realistically a matter of degree rather than one of black and white." *Id.* at 159, 456 P.2d at 803. Here, the trial judge advised Dr. Wetzler that "we don't have impaired or diminished capacity in Idaho as a defense." The doctor replied "You said there is no—according to the law, you can't say 50% and 75%. It's either whole or none." The statute requires that the accused lack substantial capacity—not total capacity. In our opinion, the trial court's interpretation of the statute was erroneous. Thus, evidence of the affirmative defense and an appropriate jury instruction were not presented to the jury.

Having determined that the interpretation of the statute was erroneous, we must now determine whether the error affected Scroggie's substantial right to avail himself of the affirmative defense and, consequently, contributed to his conviction. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. LePage,* 102 Idaho at 393–97, 630 P.2d at 680–84. *State v. Rutherford,* 107 Idaho at 916, 693 P.2d at 1118; I.C. § 19–3702; I.C.R. 52. Before a fundamental error can be held harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Rutherford,* 107 Idaho at 916, 693 P.2d at 1118, *quoting LePage,* 102 Idaho at 393, 630 P.2d at 680. This standard is usually applied in two situations. When the asserted error pertains to material admitted at trial, our test is whether it appears from the record beyond a reasonable doubt that the jury would have reached the same result had the material not been admitted. *State v. Palin,* 106 Idaho 70, 675 P.2d 49 (Ct.App. 1983). *See generally* Burnett, *Standards of Appellate Review in State and Federal Courts,* IDAHO APPELLATE HANDBOOK § 3.5.2 (Idaho Law Foundation 1985). When the error, as here, concerns material omitted at trial, our test is whether there is a reasonable possibility that the lack of the omitted material might have contributed to the conviction. *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827–28; *LePage,* 102 Idaho at 396 n. 9, 630 P.2d at 683 n. 9.

Scroggie also asserts that the trial court should have given an instruction on the affirmative defense of mental illness. The state's position is that the issue was not appropriate for post-conviction relief and the requested instruction did not correctly state the law. Scroggie's instruction was basically identical to the instruction approved in *State v. White,* 93 Idaho at 156, 160, 456 P.2d at 800, 804. In this case, defense counsel retracted and the court also refused Scroggie's requested instruction on mental disease and defect.

The "defendant is entitled to have the theory of any valid defense he may have to

the charge properly submitted to the jury upon instructions given by the court." *State v. McGlochlin*, 85 Idaho 459, 466, 381 P.2d 435, 438 (1963); I.C. § 19–2132 ("the court must state to [the jury] all matters of law necessary for their information"). The two psychiatrists who examined Scroggie reached different conclusions regarding his mental state. Although the court may not believe the testimony of expert witnesses, "the solemn duty rests upon the court to instruct the jury as fairly and impartially upon the theory of the defense as upon the theory of the prosecution." *Id., quoting State v. Moultrie*, 43 Idaho 766, 775, 254 P. 520, 523 (1927)).

■ The only psychiatric evidence concerning Scroggie's mental condition was presented by Dr. Wetzler. As previously noted, Dr. Wetzler initially testified that Scroggie's mental illness severely impaired his ability to conform his conduct to the law. Although the testimony was not couched in terms of "lacking substantial capacity," the doctor initially concluded that Scroggie's condition did fall within the affirmative defense statute. After the unrecorded consultation with counsel in chambers, the applicability of the statute seemed to hinge on whether Scroggie's ability to conform was "totally obliterated." Dr. Edgren was never called to testify and his competency report was not entered into evidence. Although the jury may have ultimately rejected Scroggie's mental illness defense based on his conduct surrounding the shooting, *State v. Gerdau*, 96 Idaho 516, 531 P.2d 1161 (1975); *State v. Myers*, 94 Idaho 570, 494 P.2d 574 (1972), this issue was not presented to the jury. Trial counsel and the court misinterpreted the statute which resulted in the retraction of the applicable jury instruction. Thus, the jury was precluded from considering the affirmative defense. Given the facts of this case, we find substantial reason to question the reliability of the conviction.[7] We conclude that Scroggie was prejudiced by the misinterpretation of the statute and

the subsequent withdrawal of the proposed jury instruction. Accordingly, Scroggie's conviction must be reversed and the case remanded for a new trial.

Because this case is being remanded, we will address four other issues, for guidance to the district court on retrial. *State v. Stoddard*, 105 Idaho 533, 539, 670 P.2d 1318, 1324 (Ct.App.1983); I.C. § 1–205.

## II

Scroggie contends that the trial court erred by failing to give an instruction on involuntary manslaughter as a lesser included offense. Idaho Code § 19–2132 requires the court to "instruct the jury on lesser included offenses when they are supported by a reasonable view of the evidence." Scroggie maintains that his consumption of alcohol affected his ability to form an intent to kill and supported the giving of the requested instruction. The court refused the proposed instruction because there was no "evidence to support involuntary manslaughter." Trial counsel made no objection when the court refused this instruction. Scroggie has not argued on appeal that counsel's failure to object to the refused instruction was ineffective assistance. The state argues that reasonable view of the evidence would not require the court to give the requested instruction. *State v. Atwood*, 105 Idaho 315, 669 P.2d 204 (Ct.App.1983).

Voluntary manslaughter was defined at that time as the unlawful killing of a human being, without malice "in the perpetration of any unlawful act, other than arson, rape, robbery, kidnapping, burglary, or mayhem; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." I.C. § 18–4006 (amended 1984). "The elements of voluntary manslaughter are: (a) an unlawful killing, with (b) the intent to kill, but without malice. The elements of involuntary manslaughter are: (a) an unlawful killing, without [ (b) ] malice and without an intent to kill." *At-*

---

7. In *State v. Olin*, No. 15753 (Ct.App. Dec. 31, 1985) we held we would not speculate on how the

jury might have viewed the evidence with a proper set of instructions.

*wood,* 105 Idaho at 318, 669 P.2d at 207. Without speculating on the evidence to be presented at the new trial, we note "[a]n offense will be deemed to be a lesser included offense of another, greater offense, if all the elements required to sustain a conviction of the lesser included offense are included within the elements needed to sustain a conviction of the greater offense." *State v. McCormick,* 100 Idaho 111, 114, 594 P.2d 149, 152 (1979); *Atwood,* 105 Idaho at 318, 669 P.2d at 207.

## III

Scroggie next asserts that the trial court committed reversible error when it improperly admitted two hearsay statements. The first statement was overheard by Eileen's next door neighbor. The neighbor testified at trial that he heard a young male voice proclaim "No Dad, don't do this. Let's leave." Scroggie also contends that the court admitted a hearsay statement when it permitted a police detective to testify that Eileen said she bought a gun to protect herself from Mr. Scroggie. Trial counsel objected to the admission of both statements but these objections were overruled. The state asserts that neither statement was hearsay, but even if hearsay, the statements were properly admitted as exceptions to the hearsay rule.

## A

■ The state contends that because the neighbor's testimony was not offered in evidence to prove the truth of the statement "No Dad, don't do this.", the statement was not hearsay. Therefore, it could be related by the witness for the purpose of showing "Dad" (Scroggie) was acting with premeditation or specific intent in whatever he was about to do. *State v. Ziegler,* 107 Idaho 1133, 695 P.2d 1272 (Ct. App.1985). The district court characterized the statement as "a spontaneous-type thing and would be an exception to the hearsay rule." *See, e.g.,* I.R.E. 803(1), (2). We agree with the state's view, however. The testimony of the neighbor obviously was not for the purpose of proving the truth of

the overheard statement. It is more correct to say that no hearsay was involved, rather than to say the statement was an "exception" to the rule against admitting hearsay. We find that no error was committed in allowing the neighbor to testify about what he heard.

## B

Scroggie also asserts that prejudicial hearsay was admitted during the investigating detective's redirect examination. The prosecutor asked why the police did not treat a revolver found in Eileen's purse on the night of the shooting as an integral part of the investigation. The detective replied:

[Witness]: I asked Mrs. Scroggie if she could identify it. She said that—

[Defense Counsel]: I will object to that response as being hearsay.

.    .    .    .    .

THE COURT: I will overrule the objection.

[Witness]: Mrs. Scroggie indicated that the weapon was purchased and given to her by the decedent, A.W. Barron, as she was afraid of her estranged husband, Jesse Scroggie; that it was for her personal protection as he had assaulted her in the past.

The state argues that the statement was not offered for the truth of the matter asserted and was admissible as *res gestae.*

■ We believe the detective's statement was hearsay. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." I.R.E. 801(c). Hearsay is not admissible unless the statement falls within one of the innumerated hearsay exceptions. I.R.E. 802. Rather than determining whether this statement is part of the *res gestae* or otherwise prejudicial, we would direct the trial court's attention to the new Idaho Rules of Evidence. *See generally,* IDAHO STATE BAR EVIDENCE COMMITTEE, IDAHO

RULES OF EVIDENCE, 803(1), (2), (3) comments (1985) (discussing *res gestae*).

## IV

Finally, we note on remand that the affirmative defense of mental defect as it existed at the time of the trial will be available to Scroggie at his new trial. I.C. § 18–207 to –209 (repealed 1982). As the United States Supreme Court stated in Dobbert v. Florida, "it is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute ... which deprives one charged with crime of any defense available according to the law at the time when the act was committed is prohibited as ex post facto." 432 U.S. 282, 292 (1977), *quoting Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925). *See* UNITED STATES CONST. art. 1, § 10; IDAHO CONST. art. 1, § 16; *State v. Byers*, 102 Idaho 159, 627 P.2d 788 (1981).

Scroggie's conviction for second degree murder is reversed. The case is remanded for new trial.

BURNETT and SWANSTROM, JJ., concur.