815 P.2d 1077

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Laurence Melvin BABBITT, Defendant–Appellant.**

**No. 18712.**

Court of Appeals of Idaho.

July 26, 1991.

Petition for Review Denied Sept. 17, 1991.

Thomas A. Mitchell, John T. Mitchell, Coeur d'Alene, for defendant-appellant.

Larry J. EchoHawk, Atty. Gen., Michael J. Kane, Deputy Atty. Gen., Boise, for plaintiff-respondent.

WALTERS, Chief Judge.

Laurence Babbitt shot and killed Lee Elwell during a confrontation at the home of

Babbitt's daughter in August, 1989. Babbitt was charged with second degree murder. Following trial by jury, the jury found Babbitt guilty of voluntary manslaughter. During the trial, the prosecutor was permitted—over Babbitt's objection—to present evidence of prior occasions where Babbitt had defended himself with his fists and without a weapon, in fights with other persons. On appeal from the judgment of conviction, Babbitt argues that the admission of this evidence was reversible error and that the trial court committed further error by denying Babbitt's motions for mistrial and for a new trial based upon the allegedly inadmissible evidence. We affirm.

The facts surrounding the shooting incident are as follows. Babbitt's daughter, Cara, lived with her two-year old daughter in a small, four-room house in Coeur d'Alene. Her boyfriend, Lee Elwell, usually lived at the house also. In August, 1989, Cara was seven months pregnant with Elwell's child. The defendant, Babbitt, who recently had been hospitalized as a result of a poisonous spider bite, had moved in with Cara earlier that month. Cara and Elwell were prone to having fights when either or both of them had had too much alcohol to drink. Considering Cara's pregnancy, they had reached an understanding that if one or the other of them drank too much alcohol on a given evening, that person would sleep somewhere other than in the home to avoid arguments.

On the evening of August 29, Cara found Elwell at a nearby tavern. She later testified that "I was mad at him because I knew he was going to stay at the bar and drink beer all night. I was just mad at him, I didn't think that was where he should be." She let Elwell know her feelings by "[j]ust looking at him, you know, he knew I was mad, he knew exactly why I was mad." She returned to her home and told her father that she was not going to let Elwell into the house. Cara locked the door to the house; Elwell did not have a key. She and her father retired for the night; she made a bed on the living room floor and Babbitt went to the bedroom where Cara's daughter was sleeping. Be-

fore going to bed, Babbitt removed his pistol from the kitchen cupboard where it might be found by Elwell and took it to the bedroom with him.

Around 2:30 a.m. on August 30, Elwell came to the door of the house. When he pounded on the door, Cara awoke. Elwell demanded to be let in, but Cara refused and told him to go away. He continued to argue with her from outside and said he was going to break the door down. As Elwell battered the door, Cara ran into the bathroom and closed the door. She testified that she knew there was going to be a confrontation between Elwell and Babbitt; "I knew something was going to happen when the [front] door came open, and I didn't want to be in the middle of all that" because of her pregnancy. She said she was concerned for Elwell's safety because her father would not let anything happen to her: "I figured my dad would probably just beat him up and throw him out." While she was in the bathroom she heard the front door "crash open." Then she heard a shot. She came out of the bathroom and found Elwell lying on the front porch. At Babbitt's urging, she ran next door where a friend called the police and an ambulance. When the police arrived a few minutes later, Elwell was dead. Babbitt led the police to the bedroom where he had replaced his handgun. He was arrested and charged with second degree murder.

During the trial, the prosecutor questioned Cara—the state's first witness—concerning Babbitt's past history of physical ability to fight. The court sustained Babbitt's objections on grounds of relevance. However, on cross-examination by Babbitt's counsel, she testified that she was aware Babbitt had undergone abdominal surgery in 1988, and she agreed that since his surgery he was not in any shape to fight with somebody like Lee Elwell. Later, through cross-examination of another witness for the state, the defense counsel brought out that during an interview by the police, Babbitt had indicated that—when Elwell was breaking into the house—he was in fear of his daughter's safety, his own safety and that he was in poor condi-

tion of health and he knew he could not defend himself against Elwell in his weak condition.

Babbitt testified in his defense. Consistent with the interview reported by the police, Babbitt said he shot Elwell out of fear for his daughter and himself. Describing Elwell's entry into the house, Babbitt testified: "I honestly didn't know what he was going to do. He was coming at me. He said he was going to deal with me and my daughter when he got in there." Babbitt also testified about his own health and physical condition. He related the hospitalization for the spider bite, explained his abdominal surgery and testified that he was receiving social security disability as a result of two injuries to his back. With respect to the latter condition, he testified on direct examination:

Q: When did you first qualify for social security disability?

A: First time was 1969, I was on it for about a year and a half, and then I became disabled again in 1976.

Q: In 1969 what was the particular bodily impairment that made you qualify for disability social security at that time?

A: A broken back.

Q: And then you were on it for about a year at that time?

A: Yes.

Q: When you qualified again in 1976, what was it that made you qualify that time?

A: A broken back again.

Q: How did the first broken back take place?

MR. HAYNES: Your Honor, I'm going to object to the manner of it, it's so long ago that it can't possibly be relevant.

THE COURT: I'll overrule it.

Q: (By Mr. Mitchell) Just briefly, how did the first?

A: My first broken back was on a construction accident, I was working for Frank Gurney, I was in a hole and a rock about so big fell out and hit me in the back.

Q: What about the second one in 1976?

A: It was a truck accident down in Oregon.

Q: And you have constantly been on social security disabled [sic] since 1976?

A: Yes.

Q: To the present time?

A: Yes.

Q: Pre-dating the abdominal surgery that you have described?

A: Yes.

Q: As a result of the abdominal surgery what, if any, weight change occurred?

A: I used to weigh 195. I now weigh 155.

Q: How tall are you?

A: About five-five or maybe five-five-and-a half.

Q: What's your best estimate of how tall Lee Elwell was?

A: I would say five-eight.

This testimony precipitated the following cross-examination by the prosecutor, which gives rise to the evidentiary challenge made in this appeal:

Q: You have testified a lot about the various ailments that you have, your two back surgeries. Are you telling the jury that those two back surgeries from 1969 and 1977 kept you from defending yourself just with your fists, if you needed to, on August 30th?

MR. MITCHELL: Your Honor, I object. Whether or not there have been such instances is totally irrelevant.

THE COURT: I'm going to overrule your objection, Mr. Mitchell. Go ahead.

Q: (By Mr. Haynes) Are you saying that those back surgeries kept you from defending yourself, if needed to be, with your fists?

MR. MITCHELL: Same objection, your Honor.

THE COURT: Same ruling.

A: I have had to defend myself, yes.

Q: So those back surgeries don't have anything to do with your ability to defend yourself, do they?

A: They have a great deal to do with my ability to defend myself.

Q: You have been able to do it since having the surgeries?

A: Well, I could give you one for instance.

Q: I'm not asking you for a one for instance. I'm asking you have you been able to defend yourself without the use of a gun since your back surgery in 1977?

A: Well, I didn't do a very good job, I ended up in the hospital with a broken jaw, crushed cheekbone, a broken nose, five stitches here, and 13 stitches there, and two steel plates, if you call that defending yourself.

Q: How many times have you had to defend yourself since the 1977 surgery?

MR. MITCHELL: Object, Your Honor, it's not relevant.

THE COURT: Overruled.

Q: (By Mr. Haynes) How many times have you had to defend yourself since the 1977 surgery?

A: As I recall, twice.

Q: How many times have you had to be in a fight since your 1977 surgery?

MR. MITCHELL: To which I object, Your Honor, it's not relevant.

THE COURT: I think we are drifting now over into something that might not be. I'm going to sustain that objection.

Q: (By Mr. Haynes) Have you ever stated, in fact, did you state at the preliminary hearing that your back surgeries have prevented you from being in fights?

MR. MITCHELL: Your Honor, to which I object. Whether he has been in fights or prevented from being in fights is not relevant.

THE COURT: Well, I allowed testimony on direct about the back surgeries, back even as far as 1960 something. I think, to be fair, I should allow Mr. Haynes to at least explore that part of the situation. Overruled.

Q: (By Mr. Haynes) Did you make that statement at the preliminary hearing that the back surgeries have prevented you from being in fights?

A: Yes.

Q: You have now stated that since your back surgeries you have been in two fights where you have had to defend yourself?

MR. MITCHELL: To which I object, your Honor. He was allowed to answer the question whether or not he had defended himself. You specifically ruled that he wasn't allowed to go into the question of fights.

THE COURT: Well, I think we're dealing with semantics here now.

MR. MITCHELL: No, I think we're dealing with error, your Honor.

THE COURT: I'll be the judge of that. Why don't you rephrase that question.

Q: (By Mr. Haynes) When you said at the preliminary hearing that your back surgeries prevent you from being in two fights, [sic] did you not? It's prevented you from being in fights, did you say that at the prelim?

A: Yes.

Q: You have now said today that since your back surgery you have been in at least two fights; is that correct?

MR. MITCHELL: Again object, your Honor. That's not what he has said, that mischaracterizes his testimony and what you allowed.

THE COURT: Sustain the objection on the form of the question.

Q: (By Mr. Haynes) Did you state today that you have defended yourself with your fists twice since your back surgeries?

MR. MITCHELL: To which I object, it mischaracterizes his testimony. He says he defended himself without a gun. And he described the result.

THE COURT: I'll overrule that. Go ahead.

A: Okay. If you want to call it defending myself—

Q: Mr. Babbitt, you need to answer my questions. If you have other things, your attorney will ask you questions.

A. I will.

Q: You have said today you have been in two situations where you defended yourself since your back surgeries?

A: Yes.

Q: With your fists?

A: The one was unsuccessful because I got attacked.

Q: Was it with your fists?

A: No, I did not fight, I got hit in the back of the head with a pool stick.

Q: Was the other with your fists?

A: Yes, it was, and I was taken to a jury trial and I got a not guilty on a battery.

Q: On self-defense?

A: Joe Daly, you can look it up.

Q: Okay. So you have been through this self-defense business before?

MR. MITCHELL: Your Honor, I object, I ask that be stricken, and I move for a mistrial.

THE COURT: Well, the motion will be denied. I will sustain the objection and admonish the jury to disregard that answer. And the question, basically. Not the answer. The question.

Q: (By Mr. Haynes) You are a person who is trained in the use of your fists as having been a boxer, are you not?

MR. MITCHELL: To which I object, your Honor, it's wholly irrelevant.

THE COURT: Well, I think I'm going to sustain it unless we can pin down foundationally the time frame on that. Essentially, I guess, what I'm viewing, that is such a broad question, and he testified he's 40 some years old, he may have been trained when he was 15.

THE WITNESS: Your Honor, if my attorney doesn't mind, I'd like to answer that question.

MR. MITCHELL: No, let's play it my way, okay?

THE WITNESS: Okay.

THE COURT: Mr. Babbitt, that's exactly what you should do.

Q: (By Mr. Haynes) You have been a boxer, have you not?

MR. MITCHELL: To which I object, your Honor, it's not relevant.

MR. HAYNES: I can't get to foundation without asking the foundation.

MR. MITCHELL: Your Honor, he could go to foundation and try to move it up since his belly surgery and what he can do then, but he's avoiding it because he knows the answer. It's not being fair to the witness, your Honor.

THE COURT: I'm going to overrule that objection and allow the answer to the question, and then we'll see where we go.

Q: (By Mr. Haynes) Have you been trained as a boxer?

A: Yes. In the past I did box.

Q: When did you box?

A: I believe the last time I boxed was 1963, or possibly '62.

Q: Since that time have you been a boxing coach?

A: Yes, I have.

MR. MITCHELL: To which I object, your Honor, that's not relevant at all.

THE COURT: I'll sustain that.

Q: (By Mr. Haynes) Are you aware of whether you have a reputation as a person who can fight?

MR. MITCHELL: Your Honor, to which I object. It's totally irrelevant.

THE COURT: Sustained.

Q: (By Mr. Haynes) Is it your testimony that you could not fight the morning of August 30th when you shot Lee Elwell?

A: Yes.

The judge's explanation of his rulings in admitting the evidence and in denying the motion for mistrial was made later in the course of denying Babbitt's motion for new trial. The judge said:

THE COURT: Well, probably just as well I didn't get the state's brief, because I don't really view the matter as having much to do with character traits at all, and I have read the excerpts from the transcript.

As I view the situation, it really is all covered in Rule 404 of the Rules of Evidence under possibly the bad acts situation. First of all, the situation at the trial was, and I think we should remember that initially Mr. Babbitt was on trial for the charge of second degree murder, which basically involves allegations of the killing of a human being with malice aforethought and intentionally. The defense to that was essentially a self-defense argument, at least in part. That is the reason I viewed why the testimony was being brought in concerning Mr. Babbitt's condition.

I didn't think it relevant that anything be brought into play from somewhere back in the past, because his condition didn't have anything to do necessarily at the time with what it might have been even a year before that.

But given the fact that when Mr. Babbitt testified, he did testify, and not, I don't think, to establish a character trait for peacefulness or anything of that nature, but simply that as part of the self-defense argument and contention, that he was not in a position to be able to do much, and that was part of the reason why he thought he had to defend himself because of his health problems, that was why I thought the evidence was coming in.

I thought that it was proper to allow some limited cross-examination to meet that. The rule itself allows exceptions, the exceptions being to prove intent, malice, things of that nature. It could possibly have been perhaps to some degree brought forth in the state's case in chief to some degree if it was relevant.

In my view, and I thought I'd limited the inquiry quite a bit in this area. It was really a matter of allowing the state to meet what was being affirmatively urged by the defense as part of their self-defense theory. I think the limited inquiry into that area was proper.

I'll stand by my former ruling made during the trial, and deny the motion.

Babbitt challenges the trial court's rulings by contending the court should not have admitted testimony of what amounts to prior bad acts, or prior occasions of combat without a firearm, at previous times when Babbitt's physical condition was better than when he later shot Elwell. We are not persuaded by Babbitt's argument.

Idaho Rule of Evidence 103 provides guidance for resolution of the question raised in this appeal. In pertinent part, this Rule states that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." The Rule does not attempt to define what constitutes an error affecting a "substantial right," leaving the extent of that determination to be made on a case-by-case basis. G. BELL *Handbook of Evidence for the Idaho Lawyer* 37 (3d ed. 1987), *citing State v. LePage*, 102 Idaho 387, 630 P.2d 674 (1981).

Here, we conclude that Babbitt has not satisfactorily demonstrated any effect upon a substantial right with regard to the trial court's ruling in admitting the testimony about Babbitt's ability to defend himself during the confrontation with Lee Elwell. Furthermore, it will be recalled that the objectionable questions were posed during the cross-examination of Babbitt. At that time, as the trial court later noted, Babbitt already had testified as to limitations of his physical abilities due to the condition of his health, and indicating the assertion of self-defense as a justification for shooting Elwell. In this regard, Idaho Rule of Evidence 611 permits cross-examination on the subject matter of the direct examination of a witness and upon matters affecting the credibility of the witness. In our view, the cross-examination by the prosecutor clearly was designed to provide a basis upon which the jury ultimately could reach a conclusion whether to believe Babbitt's version of his reason for killing Elwell under the circumstances described by all of the witnesses. Essentially, the trial court used this same rationale in giving its reasons for denying Babbitt's motion for a new trial.

We find no error in the admission of the evidence; consequently, we also conclude the trial court did not err in denying Babbitt's motion for mistrial and motion for a new trial. We have considered other arguments made by Babbitt on appeal, within the context of the issues specified for review, and find them without merit.

The judgment of conviction for voluntary manslaughter is affirmed.

SWANSTROM and SILAK, JJ., concur.